MEMORANDUM
 

 OBERDORFER, District Judge.
 

 In an Order filed March 10, 1983, the Court gave the parents of the individual American plaintiffs who are participants in the global settlement until April 8, 1983, to review the then latest draft of a central trust proposed by the guardian
 
 ad litem
 
 and to submit their written comments. A final hearing was held on this subject on February 10, 1983, after notice to all parents. Before and after that hearing, the Court received a number of letters from the par
 
 *553
 
 ents of settlement participants, commenting on various aspects of the proposed trust. Those letters have all been placed in the court record in this case.
 

 Under the terms of the Stipulation of Compromise Settlement, authority to allocate the settlement proceeds is vested exclusively in this Court, unencumbered by any representation or understanding of representations not reflected in the language of the Stipulation.
 
 [1]
 
 In furtherance of this responsibility, the Court has made interim payments of fees and expenses of plaintiffs’ attorneys and to the guardians
 
 ad litem,
 

 [2]
 

 and on February 16,1983, the Court authorized a payment of $100,000 to each individual plaintiff free of trust. The Court has also spent considerable time and effort on the question of whether a central trust should be created with the balance of the settlement proceeds, and if so, what form that trust should take. The Court has carefully reviewed and reflected upon the recommendations and advice of the guardians
 
 ad litem
 
 and the
 
 amicus curiae
 
 and has given particular attention to the comments by and on behalf of the adoptive parents of the infant plaintiffs.
 

 For reasons stated in the Court’s Memorandum filed February 18,1983, some of which are restated and amplified here, the Court concludes that the guardian
 
 ad litem
 
 should be authorized to set up a central trust, but that the proposed trust instrument should be modified in some respects to meet the concerns expressed by the parents.
 

 The Court has weighed a number of factors in support of the creation of a central trust. The most important factor is the universal prediction of plaintiffs’ medical experts that over time some unidentified (and at present unidentifiable) number of plaintiffs are likely to suffer more serious symptoms of injury than they do now. Those plaintiffs may well have a need for funds in excess of the $100,000 which has been distributed to them, and it is predicted that the special future needs of those plaintiffs could not be met adequately if the amounts now available for a central trust were scattered by an additional payment of $50,000 to each plaintiff. Most parents naturally hope and expect that their children will not be among the stricken, but many have recognized the need of a “safety net” for those who prove in time to be less fortunate. The guardian
 
 ad litem
 
 took this need so seriously that a central trust was a critical element of his recommendation of the settlement.
 
 See
 
 Report and Recommendation of the Guardian
 
 Ad Litem
 
 (August 25, 1982). He has argued, quite convincingly, that a central trust is the only instrument presently available for this purpose.
 

 Before and since the Stipulation, the guardian
 
 ad litem,
 
 the Court, and others have searched in vain for a feasible alternative safety net that could meet the projected needs of the plaintiffs without the inherent problems of a central- trust. The only theoretical alternative — insurance—has proved so far not to be available. On the chance that some break-through will later make insurance available, the proposed trust is structured to permit a shift to insurance should that option become available. In addition, the Court, by this Memorandum, requests the guardian
 
 ad litem
 
 to further modify the proposed trust to require periodic re-examination of the insurance alternative. For the present, however, the demonstrated need for a safety net and the absence of any viable alternative are the principle bases for the decision to approve the central trust.
 

 A further basis for the decision is the reasonable expectation of those parents concerned about the need for a safety net that the Court would follow the guardian’s recommendation in this respect. This is not to say that these parents had a legally enforceable reliance interest in a central trust or that they had reason to believe that the recommendation of the guardian
 
 ad litem
 
 would be binding on the Court. But
 
 *554
 
 they were entitled to assume that the Court knew and would respect the guardian’s conscientious commitment to the childrens’ interests and that his recommendation would carry great weight. Some parents whose children were reportedly at greater risk than others presumably accepted the settlement on the assumption that the guardian would strongly recommend and the Court would be likely to approve a safety net of some kind.
 

 It is noticeable that those parents who feel the need for a safety net have not been as vocal as those who oppose the central trust. But the representatives of the parents’ committee who met with the Court, and particularly Colonel Gaylor
 
 [3]
 
 (who has kept most thoroughly involved in these developments) have recognized both the need and justice of some kind of safety net and the fact that a central trust is the most feasible device presently available to meet that need. The Court itself expressed such interest in a central trust from time to time that some of those who preferred it may have been lulled into a sufficient sense of security that they felt no need to echo personally what the guardian ad
 
 litem
 
 and plaintiffs’ trial counsel were saying for them on the record.
 

 Another consideration has been the Court’s duty to carry out the Stipulation of Compromise Settlement in a way that is most likely to discourage later disaffirmance of the settlement by the infant plaintiffs. This can best be achieved by implementing the settlement agreement in a way that is most likely to meet both the needs of the plaintiffs and the reasonable expectations of those who accepted the settlement on their behalf. The Court is persuaded that, in the particular circumstances here, the combination originally recommended by the guardian ad
 
 litem
 
 of a substantial distribution free of trust supplemented by a safety net in the form of a trust is the arrangement most likely to protect the settlement and to preclude disaffirmance.
 

 In reaching these conclusions, the Court has carefully considered the independent submissions made on behalf of plaintiffs Dewey, Schneider, Colgan, Carnie, Zimmerly, Chione, McCartney, and Wright, copies of which have been filed in the public record and served on all counsel of record.
 

 The Dewey letter of March 30 suggests that the parents have been precluded from addressing the Court, despite the fact that the Court has held three hearings after full notice since November for the express purpose of affording parents an opportunity to be heard personally instead of through the guardian
 
 ad litem
 
 or trial counsel. The Court regrets that the Deweys did not avail themselves of those opportunities, because the affidavit attached to their letter is thoughtful and useful. The Court is satisfied that, in light of those earlier opportunities and the comprehensiveness of the Deweys’ affidavit, the Court has had the full benefit of their information and views.
 

 The Deweys’ affidavit features a questionnaire that they distributed to all of the parents involved in the settlement. The questionnaire sought the parents’ opinions about the central trust and about the proposal to retain a Medical Advisor to provide medical advice to the parents and the Co-Trustee. Eight responses favored the central trust, sixteen did not favor it, and two were apparently undecided. Nineteen did not respond at all. Only two of the eight respondents favored a trust for the benefit of their own children. Seven favored it for the benefit of other children with serious problems; one favored it for unspecified reasons. As between a central trust and insurance (if it were feasible), two favored the central trust, thirteen favored insurance, and eight preferred neither. Two foresaw use for the services of a Medical Ad-visor over the next five years; twenty-one did not. One did not know.
 

 The Deweys therefore oppose the central trust, because neither the defendants nor a majority of the parents responding to their questionnaire favor it. They are not persuaded by the suggestion of catastrophic
 
 *555
 
 risk. In addition, they demonstrate the extent to which the trust expenses forecast by the guardian
 
 ad litem
 
 would hamper appreciation of the trust corpus by compounding; they claim that the appreciation from per capita distribution would gross $2 million more than the appreciation reasonably anticipated by a central trust burdened by the contemplated expense of administering it.
 
 [4]
 
 They vigorously question the potential effectiveness of the Medical Advisor, and express a strong preference for reliance on local specialists. In addition, they mention the confusion about whether defendants demanded a central trust as a condition of settlement.
 
 [5]
 
 The Deweys urge the Court to reject the central trust “as unnecessary, wasteful, ineffective and unrealistic” and to distribute the balance per capita, i.e. as the $100,000 has been distributed. In the alternative, they urge cost control, the appointment of a non-lawyer as trustee, elimination of the Medical Advisor, with medical services to be obtained as needed rather than on a retainer such as proposed in the pending draft of the central trust, and per capita distributions in 5 or 6 years, instead of the 10 now contemplated in the trust draft.
 

 Written comments by five parents responding to the Deweys’ questionnaire are noteworthy. One recognized that the cost for the Medical Advisor and co-trustee will be high for the first couple of years, but expressed the hope and expectation that “this will die down.”
 
 [6]
 
 Another set of parents stated a preference for an individual trust, but considered that they had agreed to a central trust “for the protection of those children, if any, whose needs come to exceed the resources of their families.” A third parent felt that the Deweys had stated some valid reasons, but did not “really know which way would serve the needs of the children” and expressed a desire “to do the right thing for the other children.” This third parent would therefore “support the parents if they decide against the central trust.” A fourth expressed concern about “youngsters” like their own child “whose needs appear to be greater.” They “would gladly devote $50,000 to a Central Trust in hope we never have to use it. In summation,” they continued, “we are satisfied that the Parent Advisory Committee and the Guardian Ad Litem have acted in the best interest of all and that the Central Trust concept is the answer to future contingencies.”
 
 [7]
 

 The Deweys did not enclose the fifth response by Colonel Gaylor, except to complain that it had been circulated to the other parents from the office of the guardian
 
 ad litem.
 
 Colonel Gaylor responded in great detail. She noted the investigation of the insurance alternative by the United States, Lockheed, the guardians
 
 ad litem,
 
 counsel, and, finally, the Court. She favored a “possibility” of using the services of the Medical Advisor within the next five years. She did not expect to use the Medical Advisor’s assistance “tomorrow,” but she “might in one year — who knows.” She noted the Deweys’ statement that they are morally and legally bound to their son and inquired whether they were not also morally bound to other seriously injured children. She pointed out that the proposed trust did not provide for expenditure of $90,000 for trust administration and medical service,
 
 *556
 
 but rather imposed a $90,000
 
 ceiling
 
 on such expenditures. She believed that the trust would earn more than the return anticipated by the Deweys’ individual trustee and that, while the appreciation on an individual distribution might increase the Deweys’ ability to meet their child’s long-term needs, it would not be sufficient to meet catastrophe needs should his situation prove to be more serious than now anticipated. Colonel Gaylor responded to complaints about the Medical Advisor by stating her opinion that the circumstances of the infant plaintiffs required the services of an expert on MBD, and that the reporting requirements would not invade the plaintiffs’ privacy to the extent anticipated by the Deweys.
 

 In addition to these and a number of other letters from parents, the Court received further comments from counsel for plaintiff Schneider reiterating his earlier opposition to “the entire concept of the trust as an expensive, unwarranted invasion of his property and privacy rights.” Schneider’s counsel urged that the Medical Advisor’s role be reduced in scope and his services paid for as used by individual children and their parents, “or omitted entirely.” They recommended designation of a retired trust officer, businessman, physician, or some other non-lawyer as trustee, and they questioned the $2,000 estimate of the annual cost of counsel and accounting services required by the trust. They urged that the first consideration of possible distribution occur in five years, instead of the ten contemplated by the proposed trust. Finally, they strongly urged that the Court preclude the Medical Advisor from making medical information about the individual plaintiffs available “to anyone in connection with other litigation relating to the crash or otherwise.”
 

 After several years
 
 [8]
 
 of experience with the various ramifications of this complex matter, the Court is convinced that, contrary to the views of this vocal minority of the parents, some children are at risk of substantial future increase in their crash-related symptoms. Precise prediction of which children will be affected and to what extent they will be in need of future catastrophe assistance is impossible — that has been the major problem throughout this entire litigation, which continues to drag on, even after an admission of liability by defendants in 1979. The concept of some kind of central trust as a solution to this problem, originally as an interim solution, has been under consideration since at least May 1980,
 
 see
 
 Memorandum and Order (filed May 30, 1980), when it first became apparent that “a long series of jury trials for damages may be too crude an instrument to achieve justice for all parties here.”
 
 Id.
 
 at 5. In the 10 full trials that have so far been held in these cases, children who, according to plaintiffs’ experts, are in approximately the same category of risk have received verdicts ranging from zero to $1,000,000. A central trust, from which payments can be made according to actual rather than merely predicted needs, appears to be the most feasible solution to this problem.
 

 Counsel for the Schneiders have, from time to time, questioned the jurisdiction of this Court to create this trust. They have asserted that the property rights of their client which were created pursuant to the settlement are strictly a matter for local supervision. The Court is sensitive to the potential federalism concerns raised by the Schneiders. It is for that reason that the Court lifted most of the conditions originally imposed on receipt of the individual distributions of $100,000, leaving supervision of those individual awards in the capable hands of the local courts. However, the central trust is another matter.
 

 The jurisdiction of this Court was a condition of the settlement agreement, which stated that all distribution of the settlement proceeds would be within this Court’s dis
 
 *557
 
 cretion. Jurisdiction .cannot, of course, be conferred on a federal court by agreement where jurisdiction does not otherwise exist, since all federal courts are courts of limited jurisdiction. However, the jurisdiction of this Court over the underlying dispute that is the subject of the settlement is undisputed. That jurisdiction extends to all proceedings that arise from the central litigation, including the final consummation of the settlement. The settlement was not binding on the parties without the approval of the Court,
 
 see
 
 Fed.R.Civ.P. 17(c), and by the Stipulation’s own terms it is not final until the proceeds have been distributed at the Court’s direction.
 

 It should also be noted that the settlement itself did no more than provide a lump sum of $13,500,000 in return for the dismissal of 45 claims. It did
 
 not
 
 specifically provide for payment of $300,000 to each plaintiff. Contrary to the assertions of Schneider’s counsel, therefore, no property rights vest in the individual plaintiffs until and unless the Court exercises its discretion to distribute some portion of the settlement proceeds to them.
 
 [9]
 

 In creating and retaining general supervision over a central trust in this case, therefore, the Court is relying on its undisputed jurisdiction over the original litigation,
 
 [10]
 
 its responsibility under Rule 17(c) to safeguard the interests of infant litigants who appear before it, and its responsibility under the Stipulation, voluntarily assumed when the Court approved the settlement, to effectuate the settlement, both in letter and in spirit.
 

 The Court is satisfied that a central trust should be created substantially in the form suggested by the guardians
 
 ad litem.
 
 However, some of the changes suggested by the parents to better tailor the trust instrument to their perception of their children’s needs deserve further attention.
 

 The Court shares the concern expressed about the expenses estimated for the Medical Advisor and the trust administration. The expenses now known are more than they should be and there is a risk that they have been underestimated. The Court also shares the misgivings expressed by the parents about a retained Medical Advisor. The Court concludes that the role contemplated for the Medical Advisor and the fixed expense that a retainer would entail can be substantially reduced. Accordingly, the guardians
 
 ad litem
 
 are requested to revise the proposed trust to provide (1) that any services rendered by the Medical Advisor to individual plaintiffs be pursuant to compensation and other arrangements made by him directly with those individual parents who desire his medical services, and (2) that the Co-Trustee negotiate an appropriate agreement, either on a retainer, per diem, or hourly basis, only for such medical advisory services as the Co-Trustee may require for the performance of
 
 his
 
 duties under the trust. The Co-Trustee should also consider and report to the Court about engaging some individual or agency to maintain the medical information to be accumulated, hopefully at rates less than those charged by a medical doctor.
 

 In stating his opposition to some of these changes when they were first proposed, the guardian
 
 ad litem
 
 argued that the participation of the Medical Advisor, an expert on MBD, in the development of a treatment plan for each child would be an important function of the trust, since early and effective treatment now will significantly reduce the probability that any given child will
 
 *558
 
 require catastrophe assistance later. The argument for effective treatment now is a convincing one; however, the Court is satisfied that most, if not all, parents are already developing and pursuing such treatment plans with the assistance of their personally chosen local doctors. Compulsory intervention in this process by a court-appointed medical expert would be clearly inappropriate, and there does not appear to be sufficient interest in voluntary use of the Medical Advisor’s services to justify imposing such a heavy expense on the trust. Any parent who wishes to consult with the Medical Advisor or any other expert recommended by the Co-Trustee is, of course, free to do so on an individual basis.
 

 The Court is also impressed with the suggestion that employment of a retired non-lawyer as Co-Trustee could reduce overhead substantially. The Court is fully satisfied that the creation and early activities of the trust should be directed by Mr. Work, and it may be that he or some other experienced and sensitive lawyer will be best able to perform the adjudicatory responsibility of the Co-Trustee to allocate funds.
 
 See
 
 Trust Section 6.01. However, Mr. Work will be charged with a continuing duty to search for a successor who could, after the trust becomes routinized, perform the Co-Trustee’s role on a relatively less costly basis.
 

 Finally, the Court is persuaded by the dissenting parents’ comments that Section 2.08 should be revised to encourage consideration of a per capita distribution of some or all of the corpus, including accumulated income, after five years experience with the trust.
 

 Upon presentation of appropriate proposed orders and a trust agreement cast along the lines just outlined, the Court is prepared to enter orders authorizing execution of a central trust agreement and transferring to the trustee selected of $2,500,-000
 
 [11]
 
 now held in the registry of the Court.
 

 The Court has also considered carefully the privacy claims made on behalf of plaintiff Schneider. Such claims are not in keeping with the spirit of sharing and cooperation that was shown in 1979, when all the parents (including those of foreign plaintiffs) agreed to pool the meager proceeds of the interim settlement of 1979 to finance a cooperative litigating effort. The Schneider child, whose case was the first to be tried and who received a substantial partial judgment award, was one of the principal beneficiaries of this policy. It would be most inappropriate for Schneider, who has benefitted so much from this cooperative effort, to withdraw his cooperation now that he can no longer benefit from it.
 

 It is particularly interesting to note that the exhibits to the Schneider submission apparently meant to indicate how private information about him and other plaintiffs has been misused is derived from an exhibit used at the
 
 Schneider
 
 trial.
 
 See
 
 Motion to Strike, Pursuant to Rule 11, F.R.Civ.P., and Opposition to the April 7, 1983, Request for Protective Order Filed by Denver Counsel in the Name of Plaintiff Michael Schneider (April 9, 1983).
 

 A critical aspect of the plaintiffs’ case in these proceedings has been the claim that an unusually large proportion of the children who were aboard the C-5A when it crashed exhibit symptoms of MBD. Part of the proof of each child’s case is therefore dependent upon a showing that other children were injured.
 
 See Schneider v. Lockheed Aircraft Corp.,
 
 658 F.2d 835, 852 (D.C. Cir.1981). Schneider’s objection to a continuation of this practice is ill-founded.
 

 First of all, Schneider, through his parents, voluntarily chose to continue this case with the rest of the group, and information communicated to the plaintiffs’ common attorneys is not protected by the attorney-client privilege insofar as it may be communicated to another plaintiff or used to prepare another plaintiff’s case. Schneider
 
 *559
 
 never sought to be represented by different trial counsel, and through his participation in the global settlement he is still a part of the common group represented by a central group of attorneys.
 

 Second, Schneider, like all the other infant plaintiffs, cannot claim a medical or physician-patient privilege for information discovered and introduced as evidence during the litigation. Schneider’s claim that the exhibit, which was introduced into evidence at his trial, “violates medical and attorney/client privileges and the privacy” of the plaintiffs is without foundation. The particular information to which Schneider refers is in the public record.
 

 Finally, the Court finds that Schneider is equitably estopped from asserting a privilege over this information. The studies of the plaintiffs as a group include what would normally be considered private personal information about many plaintiffs, including Schneider. Schneider accepted the benefits of these studies, first when he became one of only three plaintiffs to receive a partial judgment after trial, and second when he accepted his $100,000 distribution from the global settlement, a settlement that was made possible by this common litigation strategy.
 

 Schneider expresses concern that the information about his future medical condition, which must be submitted periodically to the trustee under the trust, will be used in future litigation. Such a use of this information is not necessarily inappropriate.
 
 [12]
 
 There is no reason why Schneider, who himself benefitted from such information about other plaintiffs, should be allowed to withdraw his cooperation from those members of the group who were not so fortunate as to be “first in line” for trial. The fact that the Schneider child’s case has now been settled while others remain pending is to some degree the result of random factors, including the fact that Schneider was adopted by American rather than foreign parents and the order in which the cases were tried. The principal of equitable estoppel therefore applies to the use of this information as well.
 

 The Court is concerned, however, that the reporting requirements under the trust not be abused. The guardian
 
 ad litem
 
 is therefore instructed to modify the reporting provisions in the trust so as to provide that medical reports and other private information about an individual plaintiff may be received in complete form only by the Co-Trustee, the Trustee, their medical consultant, and plaintiffs’ counsel. It may also be divulged to anyone by consent of that plaintiff’s personal representatives. Information drawn from periodic reports from the plaintiffs may be provided to others for the purposes of litigation only after removal of names and other identifying information. Information from which identifying information has not been removed may be further disclosed, introduced at trial, or used for nonlitigation purposes only with prior leave of the Court.
 

 Any plaintiff whose personal representatives do not wish to submit the periodic reports required by the trust and by the disbursement orders granting the $100,000 individual distributions may cease to do so. However, any plaintiff for whom such reports are not received will, as a result of his voluntary withdrawal from the group,
 
 [13]
 
 cease to be a beneficiary under the trust, and will be ineligible for disbursements from the trust for catastrophe needs, insurance, or any per capita distribution.
 

 [1]
 

 . See Memorandum of February 16, 1983, at 2-3, 10-12.
 

 [2]
 

 . Final decision on these matters is still under advisement.
 

 [3]
 

 . Colonel Gaylor is the adoptive parent of plaintiff Katherine Wright.
 

 [4]
 

 . The Deweys attached to their affidavit a letter from Colorado National Bank of Denver, which is serving as trustee of the trust created by the Deweys from the settlement proceeds. According to the Bank, an addition of $50,000 to the corpus of the Deweys’ existing trust would increase the trustee’s flexibility in investment, while increasing the cost of administering the trust by only 25 percent. The Bank also suggested medical insurance as an alternative. At the Court’s request, the guardian
 
 ad litem
 
 contacted the Deweys’ Bank to discover if the Bank had any specific information about insurance that might be available. He found that the Bank had not based this suggestion on any such information.
 

 [5]
 

 . This issue was discussed fully in the Court’s Memorandum of February 16, 1983.
 

 [6]
 

 . This hope is reflected in section 5.06 of the trust draft.
 

 [7]
 

 . This attitude was echoed in a letter to the Court from the Zimmerlys, who said of the central trust, “if it would help just one child, it would be worth it all.”
 

 [8]
 

 . This case was originally assigned to the late Judge Jones in 1975. It was reassigned to this Court in 1977 and this Court has supervised nearly all subsequent proceedings, including a motion for preliminary injunction to create an interim central trust, which became the subject of an ultimately unsuccessful settlement negotiation, and five full-length trials.
 

 [9]
 

 . Under this analysis, it could reasonably be said that the $100,000 individual 'distributions already paid to the plaintiffs are vested property interests, at least to the extent that it may be beyond the power of this Court to recall those funds for another purpose, such as inclusion in the central trust. Those funds are now under the supervision of the local courts, although this Court retains the power to condition further payments, e.g., from the central trust, on compliance with the general requirement that those original distributions be used for the interests of the infant plaintiffs.
 

 [10]
 

 . To the extent that the central trust device is a remedy for the failures of the jury system in this litigation, it is in a sense a continuation of the litigation, insofar as it will, using funds contributed by defendants, provide supplemental recoveries for those plaintiffs who actually suffer greater damages.
 

 [11]
 

 . The Court reserves decision on the allocation of interest earned on these funds while in the Registry of the Court, as well as any amounts that may remain after final payments for fees and expenses. Those funds may be allocated to the trust or distributed to the individual plaintiffs free of trust.
 

 [12]
 

 . Defendants have their own independent set of objections to the use of this information in future trials. Those objections will be addressed at the appropriate time, when and if another plaintiff actually seeks to introduce such information at trial.
 

 [13]
 

 . Failure to provide such information would not only constitute an abandonment of that plaintiff’s responsibility to the other plaintiffs, but it would also render it impossible for the Co-Trustee to calculate effectively the present and future needs of the trust whenever a distribution was proposed from the trust.