Linda WHEELER TARPEH–
DOE, et al., Plaintiffs,

v.

UNITED STATES of America,
et al., Defendants.

Civ. A. No. 88–0270–LFO.

United States District Court,
District of Columbia.

July 24, 1991.

Madelyn E. Johnson, Asst. U.S. Atty., Sally M. Rider, Washington, D.C. (H. Rowan Gaither, Attorney Advisor, Office of Intern. Claims & Inv. Disputes, Office of the Legal Advisor, U.S. Dept. of State, Washington, D.C., of counsel), for U.S.

Randall Hunt Norton, John Jude O'Donnell, Thompson McGrail O'Donnell & Harding, Washington, D.C., for Wheeler Tarpeh–Doe.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiffs Linda Wheeler Tarpeh–Doe and Marilyn Wheeler seek relief for inju-

**430**

ries suffered by Nyenpan Tarpeh–Doe pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) & 2671 *et seq.*[1] Tarpeh–Doe is the mother of Nyenpan, an eight year old boy who is blind and suffers from severe neurological damage. Nyenpan is a long term patient and resident at the Wheat Ridge Regional Center in Wheat Ridge, Colorado, where he receives constant and complete care. Marilyn Wheeler, a Colorado resident, is Nyenpan's grandmother and legal guardian.

Linda Wheeler Tarpeh–Doe is employed by the United States Agency for International Development ("AID"). The State Department Office of Medical Services in Washington, D.C. has responsibility for the provision of health care worldwide to employees of the State Department, AID, and other government agencies. With respect to overall medical policy, the Uniform State/AID/USIA Regulations[2] provide that:

> The general medical policy of the Department of State is to assist all American employees and their dependents in obtaining the best possible medical care. This includes personnel of the Department and all agencies participating in the medical program by agreement. *This policy extends to the most remote parts of the world, so that no employee need hesitate to accept an assignment to a post where health conditions are hazardous, medical service poor, or transportation facilities limited. Principal and administrative officers, and their designees, and principal representatives of participating agencies are cautioned to be alert to any medical and health problems of employees and their dependents and to take appropriate action promptly.*

3 Foreign Affairs Manual ("FAM") § 681.-2.; Defendants' Exhibit ("Defs. ex.") 1 (emphasis supplied). The State Department, through its Office of Medical Services, provides and is responsible for overseeing Regional Medical Officers in areas of the world in which adequate local care is not available. Deposition of Jerome M. Korcak ("Korcak dep.") at 10. Regional Medical Officers are physicians responsible for the provision of "medical care, counsel and examinations for American employees and their dependents within the framework of these regulations and the capability of the physician, considering the facilities and time available." § 682.2–2(a)(1).

In 1981, AID assigned Tarpeh–Doe to a post in Monrovia, Liberia. At that time, Dr. Theodore E. Lefton was the Regional Medical Officer assigned to the embassy in Monrovia. Dr. Lefton had been stationed in Monrovia for four years (two two-year terms) and was scheduled to remain for an indefinite period. *See* Deposition of Theodore E. Lefton ("Lefton dep.") at 150. However, in March, 1982, a routine State Department inspection at the Monrovian embassy revealed widespread dissatisfaction with Dr. Lefton's attitude and lack of availability. *See* Depositions of Herbert W. Schulz ("Schulz dep.") at 30 & 58 and John J. Crowley ("Crowley dep.") at 50, 56, & 75. Following the inspection, William Swing, then U.S. Ambassador in Liberia, and Jerome M. Korcak, then Medical Director of the Office of Medical Services at the State Department in Washington, D.C., decided to curtail Dr. Lefton's assignment to Monrovia because of his poor attitude and availability. Swing preferred curtailing Dr. Lefton's assignment as early as possible. However, Dr. Korcak was reluc-

---

**1.** Plaintiffs brought this action in pursuit of several claims. Two claims alleging negligence arising outside of the United States were dismissed on October 25, 1988 because the FTCA does not authorize tort claims arising in a foreign country. *See* 28 U.S.C. § 2680(k); *see also United States v. Smith,* — U.S. —, 111 S.Ct. 1180 & at 1187 n. 11, 113 L.Ed.2d 134 (1991). On another claim, a partial summary judgment granted to plaintiffs holding that the administrative resolution of plaintiffs' foreign claims violated due process was reversed on appeal. *Tar-*

*peh–Doe v. United States,* 904 F.2d 719 (D.C.Cir. 1990), *reh. denied,* No. 89–5210 (August 13, 1990), *cert. denied,* — U.S. —, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991), *reversing Tarpeh–Doe v. United States,* 712 F.Supp. 1 (D.D.C.1989). The remaining claims allege negligence occurring in the United States.

**2.** A relevant excerpt of these regulations, submitted as Defendants' Exhibit 1, is attached as Appendix A to this Memorandum.

tant to support that preference and was not overly concerned about Dr. Lefton's provision, or more accurately, lack of provision of medical services. On May 17, 1982, following discussions in late April and early May, 1982 (including discussions with Dr. Lefton), Korcak and Swing came to an agreement to permit Dr. Lefton to remain at post until November 1, 1982. *See* Defs. exs. 2–4; *see also infra,* at 433–34. There is no evidence that Dr. Korcak gave any special instructions to Dr. Lefton or placed his service under heightened scrutiny, despite the deficiencies in his services which prompted the decision to terminate his assignment. Nor is there any evidence of any special effort by Dr. Korcak to expedite selection and assignment of either a temporary or permanent replacement for Dr. Lefton.

On May 18, 1982, while stationed with AID in Monrovia, Linda Wheeler Tarpeh–Doe delivered Nyenpan. Within three weeks of birth, the baby contracted a bacterial infection that developed into what was ultimately diagnosed as spinal meningitis. On June 5, 1982, Tarpeh–Doe brought the baby to the health unit at the United States embassy in Monrovia. On Saturday, June 5, 1982, Nyenpan was examined at the embassy health clinic by Dr. Lefton, who forthwith referred the mother and child to an American pediatrician, Dr. David E. Van Reken. Dr. Van Reken was employed by an American mission in Monrovia not affiliated with the embassy. The baby remained under Dr. Van Reken's care at local hospitals for the next twelve days. On June 17, 1982, Nyenpan, his parents, and an embassy nurse were evacuated to the United States to enable the family to seek additional medical treatment for Nyenpan. By that time, however, he was beyond hope of recovery.

Plaintiffs claim that the Department of State in Washington, D.C. violated its duty to provide Nyenpan, a dependent of its employee, with the "best possible medical care" and "to be alert to any medical and health problems of . . . dependents and to take appropriate action promptly" as required by the Uniform State/AID/USIA

Regulations. 3 FAM § 681.2. Specifically, plaintiffs allege that the following acts or omissions of defendants constituted negligence. First, plaintiffs assert that the State Department failed to inform Tarpeh–Doe that her health benefits included the option to travel to Europe or the United States to deliver her child. Second, plaintiffs claim that the State Department and its Office of Medical Services acting concurrently with the Ambassador negligently retained Dr. Lefton even after it learned of the widespread dissatisfaction with the doctor's attitude and availability. In addition, plaintiffs contend that the Office of Medical Services in Washington negligently failed to supervise Dr. Lefton adequately, especially once it was on notice of complaints about his attitude and availability and that his term had been curtailed at the time he treated Nyenpan. Third, plaintiffs allege that the State Department negligently failed to deliver to Monrovia a message from Dr. Schroeter, a neonatologist in Colorado who had been contacted by Marilyn Wheeler in preparation for evacuation, that he felt it was imperative that he speak with the treating physician in Liberia. Finally, plaintiffs claim that the Office of Medical Services in Washington negligently conducted the wrong test on a sample of spinal fluid sent to it from Monrovia for laboratory tests. Plaintiffs contend that defendants' negligence proximately caused Nyenpan's injuries. At a trial held on November 26—December 4, 1990, the parties produced through testimony and designated deposition transcripts the factual evidence summarized below.

## I.

### A. The Inspection

#### 1.

The Inspector General's office of the State Department routinely investigates embassies every three to five years. In February and March, 1982, a team of five or six inspectors from that office visited Monrovia, Liberia as part of an inspection tour that included visits to four embassies in West Africa. The inspection of the Liberian embassy took place from February 22

to March 5. *See* Plaintiffs exhibit ("Pls. ex.") 33. With respect to health services, the inspectors wrote in their final report:

The medical facility is totally inadequate. It is crowded, dingy, and antitherapeutic, among other shortcomings....

The Medical Unit must also improve its image and responsiveness. The inspectors received numerous complaints about it. Health units should make a positive contribution to morale and welfare, and the unit in Monrovia does the opposite.

. . . . .

Complaints about the quality of official US health services have been so widespread that it may be the single most significant non-environmental negative factor affecting morale at this post.

*Id.*, Inspection Memoranda 6.2f & 1.2 at 5. When the inspectors returned to Washington they met to report the results of the inspection with administrators of the Office of Medical Services, including Dr. Jerome Korcak, then Medical Director. In the debriefing, the inspectors explained to Dr. Korcak and others that employees on post had complained in particular about Dr. Lefton's attitude and availability. On April 6, 1982, soon after returning from the inspection tour, Ambassador John J. Crowley, the leader of the inspection team, visited Dr. John Beahler, then Deputy Medical Director, because he felt on a personal and professional basis that he should inform Beahler of the situation. Crowley dep. at 71. Crowley told Beahler that "there is 'widespread' discontent with Dr. Lefton's performance as RMO in Monrovia." *See Id.* at 71; Korcak's Memorandum to the File about Complaints regarding Dr. Lefton's Performance, defs. ex. 3 at 1. On April 27, members of the inspection team met with Dr. Korcak. The team informed Dr. Korcak that " 'a majority of personnel' in responses on questionnaires and in spontaneous oral complaints indicated their dissatisfaction with Dr. Lefton's attitude and availability." *Id.* at 3. They told him that "the magnitude and intensity of the complaints was unprecedented in their experience." *Id.*

Ambassador Crowley believed that "there was a remarkable level of discontent with the medical officer at this post" compared with other inspections. Crowley dep. at 56 & 63. Crowley (who emphasized that the team was not qualified to evaluate Dr. Lefton's medical competence from a technical standpoint) explained further that the general trend of complaints about Dr. Lefton were his "insensitivity, aloofness, lack of sympathy, lack of ... bedside manner, and also frequent unavailability." *Id.* at 49. Herbert W. Schultz, a member of the inspection team, also stated that the intensity and magnitude of the complaints about Dr. Lefton's attitude and availability were unprecedented. Schultz dep. at 58. Schultz believed that the problem was that Dr. Lefton did not care and was not available outside the hours of 8:00 a.m. to 5:00 p.m. *Id.* at 42.

Dr. Lefton was unavailable at times because he travelled out of Liberia for long vacation weekends. He was able to obtain free travel on Pan American Airlines because his wife worked as a flight attendant for Pan Am. Dr. Korcak was aware of these trips because following these weekends, on Monday mornings, Dr. Lefton would sometimes drop by Dr. Korcak's office in Washington. Korcak dep. at 153. He did not approve of them. *Id.* at 154.

Moreover, Dr. Korcak and others in the Office of Medical Services were informed by the inspection team and embassy officials of several incidents illustrative of Dr. Lefton's poor attitude and lack of availability that reveal an even more serious adverse effect on medical services. For example, in February or March of 1982, a U.S. Marine was injured in a car accident thirty to forty miles outside of Monrovia. Dr. Lefton was asked to go to the scene of the accident to administer medical care. He refused. Ambassador Swing felt that Dr. Lefton's refusal was unreasonable and ordered Lefton to go to the scene of the accident. *See* Crowley dep. at 49–50; Swing dep. at 17. In addition, Dr. Lefton refused a request to make a house call to administer care to a sick child on at least one occasion. *See* Dustin dep. at 37. In

another incident, Dr. Lefton failed to accompany an American who suffered from burns to the airport to be evacuated. Ambassador Swing felt this was inappropriate and went to the airport himself to show support. Swing dep. at 18–19. In general, Dr. Lefton was unwilling to respond to urgent situations. Swing dep. at 20.

2.

Ambassador Swing was aware of problems with Dr. Lefton even before the inspectors' visit. Either he or the Office of Medical Services had proposed curtailing Dr. Lefton's assignment in Monrovia earlier than March, 1982. (Testimony of Perkins). Following the inspection, Ambassador Swing, Dr. Korcak, and Dr. Lefton entered into a series of discussions that led towards the termination of Dr. Lefton's assignment in Monrovia. On April 6, following Beahler's meeting at the Office of Medical Services in Washington with Crowley in which Crowley reported that the complaints about Dr. Lefton were unprecedented, Beahler called Dr. Lefton, who was also in Washington at the time for training. Beahler related to Dr. Lefton the complaints Crowley had reported to him. Beahler suggested that Dr. Lefton discuss the situation with Ambassador Swing when he returned to Liberia to try to resolve the problem. He did not instruct Dr. Lefton to make himself more available to his patients in Liberia nor did he establish reporting requirements to assure that the Office of Medical would be apprised of any serious problem there. *See* Memorandum to the File from Jerome M. Korcak on the subject of "Complaints regarding the Performance of Theodore E. Lefton, M.D., Regional Medical Officer, Monrovia" recording Korcak's summary of meetings and telephone calls from April 6, 1982 to April 28, 1982, defs. ex. 3. On April 12, Dr. Lefton sent a letter to Swing acknowledging some of the problems and proposing certain remedies, including a reduction in the time patients were required to wait to be seen at the health unit and improved communications procedures to insure that Dr. Lefton re-

ceived messages and that patients could locate him. Pls. ex. 51.

On April 16, Korcak in Washington received a telephone call from Swing and Dr. Lefton in Monrovia. *See* Memorandum to the File from Korcak, defs. ex. 3 at 1–2. First, Korcak was advised by Swing that he and Dr. Lefton had worked out a "gentleman's agreement" that Lefton would be reassigned rather than continuing his assignment in Monrovia. Then Korcak informed Dr. Lefton (who took the phone) that he could be reassigned to Sanaa or Islamabad. Dr. Lefton requested leave without pay for a year. Korcak responded that he could not authorize leave without pay if Lefton had no other reason for it than that he did not want to work in the posts offered. Dr. Lefton said he would have to think about it. *See id.*

On April 26, Korcak met in Washington with Dr. Lefton (who accompanied an evacuee to the United States). At that time, Korcak was told by Dr. Lefton of his intention to resign because Pan Am did not fly to either of the available posts, so that his wife would not be able visit him if he accepted the assignments offered. *Id.* at 2. Korcak advised Dr. Lefton that if he (Lefton) could persuade Swing to permit him to stay in Monrovia until June, 1983, more opportunities for reassignment would be available. *Id.* Dr. Lefton then spoke in Washington to a Mr. Mandersheim.[3] Mr. Mandersheim called Ambassador Swing to urge a compromise. *Id.* On April 27, Korcak received a call from Swing who told him he had spoken with Mr. Mandersheim and that he understood that Dr. Lefton wanted to revise the "gentleman's agreement." Korcak told Swing that the assurances he had given Swing previously that the Office of Medical Services would replace Dr. Lefton promptly had been contingent on Dr. Lefton's acceptance of another assignment. Since Dr. Lefton wanted to resign instead, Korcak did not believe a doctor could be located to replace Dr. Lefton in Monrovia until the following spring, a year away. Ambassador Swing told Korcak he would reconsider his decision. *Id.*

---

**3.** Mr. Mandersheim's full name and position were not identified in the evidence produced.

434

at 2–3. On the afternoon of April 27, Korcak met with members of the investigation team who informed him of the widespread complaints about Dr. Lefton. *Id.* at 3. On April 28, Korcak phoned Ambassador Swing and told him that the inspectors' briefing had given him "a greater appreciation for the magnitude of the difficulties associated with Dr. Lefton's tenure at post." *Id.* Korcak suggested that Swing make Dr. Lefton's continuing assignment contingent on resolution of the difficulties. He assured Swing, however, that if the circumstances continued, the Office of Medical Services would proceed "with all deliberate speed" to find a replacement. Swing responded that this proposal was "the most attractive available to him." *Id.* However, on April 30, Ambassador Swing called Korcak again. He stated that, following another meeting with Dr. Lefton, he had "reached the conclusion that Dr. Lefton's reputation at post is sufficiently tarnished that an extension of his tenure beyond September, 1982 would be neither in the interest of the post nor of Dr. Lefton." Defs. ex. 2. He informed Korcak that he would permit Dr. Lefton to stay until September 1982 because he did not want the post to be without a physician and "because Dr. Lefton [had] requested this time so he could have a visit from his daughter." *Id.* Swing further informed Korcak that he thought the post could tolerate being without a physician for two or three months thereafter.

In further telephone conversations, Swing and Korcak reached a compromise permitting Dr. Lefton to remain in Monrovia until November 1, 1982. Swing confirmed this agreement in writing in a letter to Korcak dated May 17, 1982. Defs. ex. 4. Swing explained that the rationale for this decision was "(a) to give M/MED a reasonable period in which to find a replacement for Dr. Lefton; (b) to meet some of Dr. Lefton's concerns including a visit this summer by one of his children to Liberia; and (c) to provide Monrovia and the other posts in his area of jurisdiction adequate coverage until a replacement can be located and placed." *Id.* In addition, Swing expressed concern in light of Dr. Lefton's

forthcoming departure about additional responsibilities that had been given to Dr. Lefton to provide emergency coverage to Dakar and areas around it when another doctor would be on leave in August. *Id.* On June 15, 1982, Korcak wrote a letter to Dr. Lefton in which he again raised the issue of reassignment. *See* Defs. ex. 5 (partially illegible copy). On June 16, Korcak wrote to Ambassador Swing and informed him of the letter to Dr. Lefton. He added, in response to Swing's concern about the decision to add coverage of Dakar to Dr. Lefton's responsibilities, that he did not believe that Dr. Lefton's planned departure constituted reason to reconsider that decision. Defs. ex. 6; Pls. ex. 53 (partially illegible copy). Korcak further noted that he was under a recent "modified hiring freeze," raising additional concerns about approval of a replacement. *Id.*

Korcak made several attempts to reassign Dr. Lefton rather than accept his resignation. At no time did Dr. Korcak instruct Dr. Lefton to make himself more available to his patients, to attend more closely to his patients' medical needs, or to immediately report any serious medical situation in Monrovia to the Office of Medical Services. This was true despite the fact that Korcak had "learned over the years that [problems with medical officers] rarely involved medical competence ... but when we did have problems, it involved physicians' attitudes, what was expected of them." Korcak dep. at 157. Korcak's uncritical response to the inspectors' reports of complaints about Dr. Lefton and to Ambassador Swing's dissatisfaction with Lefton's performance is possibly explained by Korcak's otherwise high impression of Dr. Lefton. Throughout the period of discussions, he viewed Dr. Lefton as "very positive and upbeat." *Id.* at 160. When Korcak first received complaints, he was not overly concerned because he knew Dr. Lefton as a "bright young physician who was astute and competent." *Id.* at 170–71. He had "admired his acumen" in annual medical meetings. *Id.* at 171. Korcak thought many of the complaints at post about Dr. Lefton following Dr. Lefton's difficult di-

vorce and remarriage came from persons at post who were sympathetic to Lefton's first wife. *Id.* at 161–62. As a result of considerations such as these, it did not occur to Korcak or others in the Office of Medical Services to reprimand Dr. Lefton or to establish a plan for additional medical advice, support, and supervision in the event of a serious medical situation that might (and was more likely to) occur given Dr. Lefton's poor attitude and lack of availability.

### B. The Injury

In September, 1980, Linda Wheeler Tarpeh–Doe (then Linda Wheeler) became a Certified Public Accountant. Her parents were also CPAs. She was then 23 years old. She applied for and was awarded a position as an accountant with AID. AID assigned her, for her first overseas station, to Monrovia, Liberia. On December 29, 1980, in preparation for her assignment, she began approximately five months of training in Washington, D.C. *See* Pls. ex. 28.

On May 26, 1980, Linda Wheeler left the United States. She arrived in Monrovia on May 27. The next day, she began her first day of work at the Comptroller's Officer of the AID mission there. *See* Pls. ex. 26A. In July, 1981, she developed gynecological problems. On the morning of July 7, 1981, she visited the health unit at the embassy. Either Dr. Lefton or Billie Clement, the State Department nurse stationed at the embassy health unit, told her that the embassy health unit did not treat gynecological conditions and referred her for treatment to Dr. Johnson, a local obstetrician and gynecologist. (Testimony of Tarpeh–Doe).[4] Clement called Dr. Johnson and arranged an appointment for Wheeler later that morning. Linda Wheeler visited Dr. Johnson on July 7 and 8, and again on August 1 and 20, and on September 2, 1981. *See* Pls. ex. 26A. On September 9, 1981, she visited Dr. Kassas, another local doctor, to obtain a pregnancy test. The results were positive.

She had been referred to Dr. Kassas by Nyenpan (Ben) Tarpeh–Doe, an employee of the Liberian Ministry of Justice, whom she had met on her first day in Monrovia. She visited with Ben almost daily thereafter for several months. *See* Tarpeh–Doe's daily calendar, Pls. ex. 26A. On July 12, Ben had asked her to marry him. *Id.* On September 16 and 21, Ben and Linda visited the embassy health unit so that Ben could receive a physical examination and other tests required for their marriage. On January 16, 1982, Linda Wheeler and Ben Tarpeh–Doe were married. During one of the September visits to the embassy health clinic, Linda told Dr. Lefton that she was pregnant. Dr. Lefton normally referred patients to other doctors for prenatal care but would also see a pregnant woman periodically to assure himself that things were well. Lefton dep. at 136–38. However, he scheduled no such subsequent visit for Tarpeh–Doe and did not see her again until June 4, 1982, after she had delivered her baby. *See* Embassy health records, Defs. ex. 23.

Tarpeh–Doe visited Dr. Johnson for prenatal care throughout her pregnancy, which was easy and without complications. On May 18, 1982, Tarpeh–Doe delivered Nyenpan. Her delivery, attended by Dr. Johnson at Cooper's Clinic (a local health facility unassociated with the embassy), was also complication-free. On May 21, she was released from the clinic to return to her home in Monrovia. She visited Dr. Johnson on May 23 when the baby's umbilical cord dropped and again on May 24 because the baby had thrush. On May 25, Dr. Johnson examined Tarpeh–Doe and found her to be well. On May 29, Dr. Johnson examined Nyenpan and found him to be well also. On the morning of Wednesday, June 2, Dr. Johnson again examined both mother and child. He found no sign of problems. That evening, however, according to Tarpeh–Doe's calendar notation, she became "sick with malaria." *See* Pls. ex. 26B.

---

**4.** Ben Tarpeh–Doe, who married Linda Wheeler, did not testify at trial. All references to the testimony of Tarpeh–Doe refer to Linda Wheeler Tarpeh–Doe's testimony.

The next day, Thursday, June 3, she still did not feel well. She was visited by Kate Jones Petrone. Petrone was a friend who lived in the same building. She was also employed by AID, and had begun her first assignment overseas in May, 1981, at the same time as Tarpeh–Doe. That evening, Petrone called the embassy health unit to ask that someone be sent to examine Tarpeh–Doe. In response, a Dr. Feir came to the Tarpeh–Does' apartment at approximately 10:00 p.m. He was the State Department psychiatrist assigned to the Liberian embassy (but did not live at the embassy). Nurse Billie Clement also came because Dr. Feir wanted a woman to be present. Dr. Lefton (who lived at the embassy) was unavailable; Clement could not recall why. (Testimony of Clement).

Clement found Linda in bed and Ben holding the child. Petrone recalled that Clement looked at the baby and said that she didn't think the baby looked right. Petrone Dep. at 10–11. However, Clement did not recall examining the child. (Testimony of Clement). Dr. Feir gave Linda a limited examination without being able to fully examine, diagnose and treat her. He suggested that she try to find Dr. Johnson that night and come to see Dr. Lefton at the embassy health unit the next morning. Ben located Dr. Johnson, who visited the apartment at about 1:00 a.m. on Friday, June 4. Dr. Johnson examined Linda and treated her for malaria, staph infection, and mastitis. He did not examine the baby, who was sleeping.

Later that Friday morning, Tarpeh–Doe visited the embassy health unit. There is a conflict of testimony as to whether she brought the baby with her.[5] Dr. Lefton treated her with ampicillin for mastitis. *See* Defs. ex. 23. Tarpeh–Doe had not been breast feeding while she was ill. Nevertheless, Dr. Lefton advised her to resume breast feeding. *Id.* Dr. Lefton was not aware at that time that Feir and Clement had visited Tarpeh–Doe the night before but had not examined the baby. Lefton dep. at 64. There is no indication

that he inquired into the condition of the baby or offered to see him.

Later that Friday, the baby was lethargic and was not feeding. At 5:00 p.m. that Friday evening, his parents took him to an emergency facility at Cooper's Clinic, where Dr. Tirad, a local physician, treated him with ampicillin for skin rash and fever. The baby did not improve, however. At 8:00 p.m. the same evening, his parents took him to the emergency room at the Catholic Hospital in Monrovia. There two local doctors examined him and treated him with an electrolyte solution for dehydration. He was not admitted at either facility and returned home with his parents. He slept through the night, which he had never done before.

At 9:00 a.m. on Saturday morning, June 5, Tarpeh–Doe woke Nyenpan to try to feed him. The baby "became rigid" in her arms for one to two seconds, and the Tarpeh–Does left to take him to see Dr. Johnson in his office. On their way to Dr. Johnson's office, they passed Clement. Clement expressed surprise that Tarpeh–Doe was not home in bed due to her own illness. When she heard that the baby was ill and that the parents were proceeding on their way to Dr. Johnson's office, Clement advised them to accompany her to the embassy health unit instead. (Testimony of Tarpeh–Doe). The four of them arrived at the embassy health unit at about 10:30 a.m. On the way, Nyenpan suffered a second period of rigidity, or seizure. Once there, Clement went to find Dr. Lefton. Within five minutes, Dr. Lefton arrived. He examined the baby, who experienced a third seizure at the clinic. Dr. Lefton administered gentamicin and procaine penicillin. He informed the parents that the child could be evacuated on a Pan Am flight scheduled to leave that evening at 11:00 p.m. Then, Dr. Lefton sent Mary Awantang, the State Department lab technician assigned to the Liberian embassy health unit, to find Dr. Van Reken, a pediatrician, and bring him to the clinic to examine the baby. Dr. Lefton had never referred a

5. Petrone recalled that Tarpeh–Doe brought the child with her, Petrone dep. at 11; Clement

recalled that she did not. (Testimony of Clement).

patient to Dr. Van Reken previously. Lefton Dep. at 58. A pediatrician to whom he had referred patients in the past was out of town on June 5.

When Awantang located Dr. Van Reken, he was lecturing to medical students. He left the lecture and came to the embassy, arriving at approximately 11:30 a.m. Dr. Van Reken, Dr. Lefton and the other medical personnel took Nyenpan into an examining room. After examining the baby, the doctors informed the Tarpeh–Does that their son had spinal meningitis. Dr. Van Reken said that he could "make the baby well." The Tarpeh–Does expressed their preference for evacuation to the United States. In an attempt to dissuade them, Dr. Van Reken told them of an Indian family whose child had contracted spinal meningitis. That family had flown to India for treatment. However, upon returning, they informed Van Reken of the treatment given there. It was the same treatment Van Reken would have provided in Liberia, had they stayed. The Tarpeh–Does still preferred evacuation. There is no indication that Drs. Lefton and Van Reken determined that evacuation would have been more risky than treatment in Monrovia. Nonetheless, Dr. Lefton decided not to permit the parents to evacuate. Instead, he transferred the care of the child to Dr. Van Reken. Dr. Van Reken was the head of the pediatric ward at John F. Kennedy (JFK) Hospital in Monrovia and told the Tarpeh–Does that he wanted to admit the child there. Dr. Lefton had never sent a patient to JFK and was not familiar with its facilities or conditions. Lefton dep at 59. However, Ben Tarpeh–Doe, in his reporting work for a newspaper issued by the Liberian Ministry of Justice, had researched conditions at various Monrovian hospitals. The Tarpeh–Does informed the doctors that Ben had found that the conditions at JFK were appalling. The Tarpeh–Does vehemently opposed placement of their child in JFK, noting to the doctors that the hospital was known popularly as "Just For Killing."

Over the parents' objections, and with the knowledge and concurrence of Dr. Lefton, the baby was taken to JFK by the parents, accompanied by Dr. Van Reken and Clement. They arrived at about 12:00 noon. The hospital did not place him in a room until 1:30 p.m. During that hour and a half, the parents continued to express to Dr. Van Reken their objections to admitting their child to JFK. Once the baby was given a room, Dr. Van Reken left the hospital to deliver a speech. Clement also left after the baby was admitted to a room. On Dr. Van Reken's instructions, Ben Tarpeh–Doe went to a local pharmacy to purchase certain prescriptions not available at the hospital. At 4:00 p.m., Dr. Van Reken returned and left instructions for administration of care during the night, such as when to administer various medications. Tarpeh–Doe stayed through the night accompanied by several friends, including Petrone, Charlene Fergusen, a nurse, and Welma Witten, a doctor. Fergusen and Dr. Witten's spouses were on contract with or employed by AID. The conditions at JFK were unsanitary. There were small cockroaches inside the baby's incubator that came out in large numbers when the heating unit in the incubator was turned on. There were also large cockroaches in the room and rats present both inside and outside of the room. (Testimony of Tarpeh–Doe); Petrone dep. at 14.

During the night of June 5–6, neither Dr. Van Reken nor Dr. Lefton visited the baby at JFK. Moreover, no hospital doctor could be located at crucial times during the night. Medical records from JFK indicate that the infant was treated by a Dr. Waiwaiku at 7:30 p.m., 9:00 p.m., and 6:30 a.m. Pls. ex. 2. Dr. Lefton did not know Dr. Waiwaiku, nor whether he was a resident or an intern. Lefton dep. at 161. When the times came during the night to administer medicine as specified earlier by Dr. Van Reken, Tarpeh–Doe and her friends could not find any doctor in the hospital nor any other person authorized to administer the medicines. During the night, Nyenpan developed a fever and suffered more seizures. Dr. Witten felt that he should be on oxygen. Tarpeh–Doe and her friends asked the hospital employees for oxygen but they were informed that the hospital

had only one unit and that that unit was in use. They called the embassy to ask to use an oxygen unit. Someone there informed them that the embassy had no oxygen unit. When Tarpeh–Doe and her friends were unable to locate any other doctor or a nurse during the night, Dr. Witten, concerned about a particularly bad seizure, administered valium.

Late the next morning, Sunday, June 6, Dr. Van Reken arrived at JFK. Tarpeh–Doe and her friends told Dr. Van Reken that they wanted Nyenpan transferred to another hospital. Dr. Van Reken at first refused. However, at the insistence of Tarpeh–Doe and her friends, especially Dr. Witten and Fergusen, he ultimately relented. But he asked the Tarpeh–Does not to put anything in writing about the conditions at JFK. He also requested that they leave at the hospital the prescriptions they had purchased the previous evening and not used. Early that afternoon, Nyenpan was transferred to the ELWA hospital.

The conditions at ELWA were better than those at JFK. The facilities were cleaner and the nurses were more attentive. The hospital had access to more medications. A private nurse was hired to attend the baby every night from 10:00 p.m. to 6:00 a.m. While Nyenpan was a patient at ELWA, Dr. Van Reken visited him daily. In addition, Ben Tarpeh–Doe was acquainted with a doctor at ELWA who was able to help them at times when they could not find other doctors. Dr. Lefton finally visited Tarpeh–Doe and Nyenpan at ELWA, but only once. He examined the mother but not the baby. Ambassador Swing also visited them.

Nyenpan did not improve at ELWA. He continued to suffer periodically from seizures. His temperature did not remain constant. The doctors altered the dosage and mix of medications several times. The Tarpeh–Does discussed Nyenpan's condition with Dr. Van Reken, only to be informed that he did not know what was wrong or what was causing the meningitis. The Tarpeh–Does continually asserted their preference for evacuation, and offered to pay the cost of evacuation if necessary.

After a few days at ELWA, Dr. Van Reken agreed that the child should be evacuated and offered to accompany the child if necessary. Nonetheless, the evacuation was not authorized until June 17. On June 17, Nyenpan, the Tarpeh–Does and Clement flew from Liberia to Colorado, by way of Dakar and New York. On arrival in Colorado, Nyenpan was admitted into the University of Colorado hospital.

Nyenpan was treated at the University of Colorado hospital for approximately two weeks. Doctors informed the Tarpeh–Does that their child had suffered severe brain damage. See Hospital Records, Pls. ex. 5. Towards the end of Nyenpan's stay at the University of Colorado hospital, the doctors asked the Tarpeh–Does whether they wanted the hospital to remove life support systems. The doctors believed that the child would die within twenty four hours without life support. Nyenpan's parents agreed to the removal of life support, and feeding and other tubes were removed. Defying the doctors' predictions, Nyenpan survived. (Testimony of Tarpeh–Doe); see also Pls. ex. 5 (e.g., entry for June 30 stating "do not resuscitate"). Three or four days later, on July 3, 1982, the Tarpeh–Does took Nyenpan to Marilyn Wheeler's home.

On July 25, 1982, AID assigned Tarpeh–Doe to work in its Washington, D.C. office. Nyenpan lived with her in Washington. He received daily therapy at the Hospital for Sick Children and was admitted at times to Children's Hospital. He continued to suffer from seizures. Dr. Adrian Smith, a neurologist who treated Nyenpan at Children's Hospital during that time, described his condition as spastic and non-communicative. She also stated that he was incapable of meaningful motor movements and unable to feed himself. She believed that he was blind but that there was some brain stem motion with respect to hearing. She testified that the damage was permanent, and that she was doubtful that there would be any improvement. (Testimony of Smith).

After Tarpeh–Doe had worked in Washington for more than a year, AID informed her that she would have to take another

overseas assignment. To work overseas, an employee and dependents must be granted medical clearance, i.e. examined and found medically qualified, for a post. *See* Pls. exs. 35 & 59, 3 FAM 681.6(i). Nyenpan was not granted medical clearance. The family made arrangements for him to be admitted in December, 1983, to the Wheat Ridge Regional Center in Colorado. To provide assistance for Nyenpan, the State of Colorado required that he have a resident guardian. Just before he was admitted to Wheat Ridge, Marilyn Wheeler became his legal guardian. (Testimony of Marilyn Wheeler). On April 1, 1984, Linda Wheeler Tarpeh–Doe accepted an assignment with AID in Jamaica.

At Wheat Ridge, where Nyenpan remains, and will remain for the foreseeable future, he receives extensive care. He has no independent skills. *See* Deposition of Joseph William Thompson at 22. He has no functional control over his arms and legs, though he can move them. *Id.* at 22–23. He is blind. He continues to have ten to twelve seizures a year. *Id.* at 21. Care providers feed and dress him. *Id.* at 22. They also turn him every hour or two to prevent skin breakdown. *Id.* at 18. In addition, they sometimes give him baths or massages, read him stories, or take him outside in a wheelchair. Deposition of Deborah Jean Azuero at 15. He does not communicate in any meaningful way but responds positively to the care providers who are familiar to him. Thompson dep. at 23.

### C. The Treatment

Plaintiffs allege that Drs. Lefton and Van Reken misdiagnosed and mistreated Nyenpan's illness in Monrovia. Specifically, they claim that Dr. Lefton's administration of antibiotics at the embassy health clinic on June 5, prior to any testing, masked accurate results in subsequent tests. They also argue that Nyenpan could have been evacuated immediately and that he should have been evacuated sooner than June 17. Defendants argue that the doctors' actions did not fall below the standard of care. At trial, the parties produced extensive evidence in support of their positions. This evidence, summarized below, is relevant only to the degree that it relates to the issue of whether there was a causal link between the State Department's acts and omissions in Washington, D.C. and Nyenpan's injuries.

1.

The medical experts who testified at trial agreed that Nyenpan's brain damage was caused by spinal meningitis, an infection of the meninges covering the spinal cord and brain. They suspected bacterial, rather than viral, meningitis. Bacterial meningitis can have a devastating effect very quickly in neonates (as it apparently did in Nyenpan's case). To identify the bacterial agent, the cerebrospinal fluid (CSF) of a patient, obtained by spinal tap or lumbar puncture, is cultured. Cultures of other samples can also aid in diagnosis.

However, neither Nyenpan's doctors nor the expert witnesses could identify with certainty the bacterial agent causing his meningitis—despite three CSF cultures, cultures of blood and other body fluids, and examination of other indicators such as white blood cells, glucose, potassium and sodium analyses, and temperature levels. Using the diagnoses of the various treating physicians and lab reports, the experts identified three possible agents: staphylococcus (staph), streptococcus (strep), and salmonella, all of which are endemic to Western Africa. Staph and strep are "Gram positive" bacteria, i.e. they react in a particular way to a "Gram's stain." Salmonella, on the other hand, is a "Gram negative" bacteria. Gram positive and Gram negative bacteria are treated with different antibiotics.

On June 5, when Nyenpan was first brought to the embassy health unit, Drs. Lefton and Van Reken, assisted by Clement and Awantang, took blood and stool cultures and a culture of fluid from skin lesions. In addition, Dr. Van Reken performed a lumbar puncture to obtain a CSF sample for testing. A smear of the CSF performed that morning revealed white blood cells (WBCs) and two rare Gram positive cocci on the stain of the CSF sample. *See* Defs. ex. 27; Awantang dep. at 118.

440

That result was unusual and left the medical personnel uncomfortable, since, if the baby had meningitis, the stain should have evidenced numerous bacteria. *Id.* However, the presence of WBCs indicated meningitis even without strong evidence of a bacterial agent. (Testimony of Smith). A Gram's stain of the skin fluid showed "few gram positive cocci and many WBC's." Defs. ex. 27.

After overnight culture, the CSF sample taken at the embassy health clinic on June 5 was sterile, though it had revealed two rare Gram positive cocci on smear the day before. *See* Defs. ex. 27. In contrast, fluid taken from the skin lesions, after culture overnight, demonstrated heavy growth of Gram positive cocci, which was later revealed to be staph. *Id.* Stool cultures revealed a similar form of staph. *Id.* No malarial parasites were found. Dr. Van Reken diagnosed and treated Nyenpan for "Group B" strep, a Gram positive meningitis. Pls. ex. 3.

On June 10, blood and CSF tests were repeated at ELWA. Cultures of those tests were also sterile. *Id.* and Pls. ex. 2. Dr. Van Reken requested that Mary Awantang send a portion of the CSF sample obtained on June 10 to the State Department Office of Medical Services to obtain a counter immuno-electrophoresis (CIE) test. *See* Defs. ex. 27 at 2. This test reveals specific antibodies and could have aided the doctors in detecting salmonella, were that bacteria present. *See* Pls. ex. 43; Lefton dep. at 99–100. However, instead of conducting a CIE test, the State Department in error sent the sample to a laboratory in Washington, D.C. accompanied by a request for an immuno-electrophoresis test, which is used to detect multiple sclerosis. *See* Pls. exs. 43 & 39 (cable dated June 21, 1982). When Nyenpan reached the University of Colorado hospital, blood, urine, and CSF cultures were repeated for a third time. The blood tests revealed salmonella. The other cultures were sterile. Accordingly, Nyenpan was treated in Colorado for salmonella sepsis, a blood infection. *See* Pls. ex. 5; (testimony of Dr. Wientzen).

Dr. Adrian Smith and Dr. Edward Gross, plaintiffs' experts, expressed the opinion that Nyenpan suffered from salmonella meningitis that Drs. Lefton and Van Reken failed to diagnose and treat. (Testimony of Dr. Smith, Dr. Gross). In support, they noted that a bacterial agent causing sepsis can cross the "blood/brain barrier" and lead to meningitis more readily than a bacterial agent causing a skin infection. (Testimony of Dr. Smith); *see also* Defs. ex. 34 at 965. Drs. Raoul L. Wientzen and Marianne Schuelein, defendants' experts, believed that Nyenpan's meningitis was caused by a Gram positive bacteria. (Testimony of Dr. Wientzen, Dr. Schuelein). Like Dr. Van Reken, Drs. Wientzen and Schuelein believed that the causative bacteria was Group B strep, even though strep was never cultured from any sample and skin and stool cultures had revealed staph.

2.

a.

Defendants contend that Dr. Lefton was not responsible for Nyenpan's injuries because the child was already devastated and beyond hope of recovery when his parents brought him to the embassy health unit on June 5. Dr. Lefton believed to the contrary that when the child was brought to the embassy health unit on June 5 he was neurologically and physiologically intact. *See* Pls. ex. 1B; Lefton dep. at 70. The experts offered conflicting views on the question of when Nyenpan was beyond hope of recovery. Dr. Wientzen, whose expert testimony overall was highly persuasive, offered two answers to this question. When first asked whether Nyenpan was beyond hope of recovery at the embassy health clinic, Dr. Wientzen testified that he was beyond hope sometime during the middle of the first hospital day, i.e., June 6. When asked again, though, he changed his opinion and stated that he believed the baby was beyond hope on June 5. However, he also testified that many people with the symptoms Nyenpan had on June 5 recovered to lead a normal life. (Testimony of Wientzen). Dr. Gross believed that when Nyenpan was brought to the clinic, there was no permanent structural damage

to the brain. He testified that, more likely than not, had the baby been treated aggressively for Gram negative meningitis, he would have recovered. He believed the baby became devastated some time between June 5 and June 17, and he was not sure when. (Testimony of Gross). Dr. Schuelein believed that Nyenpan was devastated by the time he arrived at the embassy health unit. (Testimony of Schuelein). The experts' conflicting opinions on this point suggest that it is very difficult if not impossible to pinpoint with certainty the earliest time at which Nyenpan was beyond hope of recovery. Nevertheless, appraisal of the testimony indicates that it is more likely than not likely that Nyenpan was beyond hope of recovery at least by the time or shortly after his transfer to ELWA on June 6. Therefore, the critical time period for administering proper care was between June 3 and June 6.

### b.

On June 5, 1982, when Dr. Lefton first examined Nyenpan and before Dr. Van Reken arrived, Lefton promptly administered procaine penicillin and gentamicin before taking any samples for culture, such as blood, skin pustule, or urine or stool samples. Dr. Lefton also did not record any pulse or respiratory readings prior to administering antibiotics. Plaintiffs contend that the antibiotics took effect so quickly that the samples obtained by Dr. Van Reken one hour later were sterile. The experts agreed that it would be below the standard of care not to obtain body fluid and other samples prior to the administration of antibiotics where possible. Nonetheless, treatment of Gram positive bacteria leads almost immediately to sterilization of CSF cultures, while treatment of Gram negative bacteria does not cause sterilization of CSF cultures for one to eleven days. *See* McCracken, Jr., *The Rate of Bacteriologic Response to Antimicrobial Therapy in Neonatal Meningitis,* 123 Amer.J.Dis. Child 547 (1972), Defs. ex. 38. Thus, it is unlikely that the medications administered by Dr. Lefton masked detection of Gram negative bacteria in the CSF smear obtained on June 5 in the hour or so that elapsed between administration and the lumbar puncture. *See id.; see also* defs.. ex. 35 at S217, Figure 4. On the other hand, it is probable that the June 4 administration of ampicillin by Dr. Tirad at Cooper's Clinic along with Dr. Lefton's administration of procaine penicillin and gentamicin on June 5 masked detection of strep, staph, or other Gram positive bacteria on June 5. *See id.;* (Testimony of Wientzen, Gross). Dr. Van Reken diagnosed Gram positive meningitis and treated Nyenpan accordingly—therefore, any masking effect of Gram positive bacteria had little or no impact on the diagnosis and treatment.

### c.

Plaintiffs further argue that the decision not to evacuate Nyenpan on June 5 was below the standard of care. Dr. Lefton stated that he did not want to evacuate the baby because of the risk of lack of oxygen on the plane while the baby was having a seizure. Lefton dep. at 177. He clarified that intubation (insertion of a tracheal tube) during a seizure would be more difficult in a plane. *Id.* at 178. However, he also stated that he was not aware that there would be no oxygen available at JFK hospital. *Id.* at 167. Dr. Gross testified that the technology and procedures that would have been required for evacuation on June 5 were no different than those that were in fact employed or available on June 17, namely intubation, suction, intravenous feeding, and oxygen. (Testimony of Gross). Dr. Wientzen testified that intubation is easier in a hospital, that lighting is better, and that shock and respiratory failure could have caused problems on an airplane. However, he did not state that it would have been dangerous to move Nyenpan on June 5. He testified that, within a 48–72 hour period from when the parents presented Nyenpan at the embassy health clinic, there was no reason not to evacuate the baby. (Testimony of Wientzen). Dr. Schuelein testified that the baby should not have been evacuated due to the risk of continued seizures and status epilepticus, which might require administration of anticonvulsants. (Testimony of Schuelein).

442

However, Nyenpan continued to suffer from seizures up to and following June 17.

Plaintiffs also contend that if Dr. Lefton felt that commercial evacuation was too dangerous, he could have requested the services of a Military Airlift Command (MAC) plane. MAC planes are specially equipped with medical equipment and personnel for transportation of severely ill or injured patients. State Department policies permit an Regional Medical Officer to request MAC services where there is (1) an immediate threat to life; (2) no adequate local facility; and (3) no other available suitable transportation. (Testimony of Dr. Paul Allen Goff, Medical Director of the Office of Medical Services since 1988); *see also* 3 FAM § 686.4–2, Pls. exs. 36 & 59. The Air Force retains the discretion whether to grant a request for a MAC plane. (Testimony of Goff); Pls. ex. 36. According to Goff, if Dr. Lefton had requested MAC services to evacuate Nyenpan, that request would have been supported by the State Department. (Testimony of Goff). Dr. Lefton made no such request.

In addition, plaintiffs contend that Nyenpan could have been evacuated sooner than June 17. The Tarpeh–Does continually requested evacuation and offered to pay for it. Within a few days of Nyenpan's admission into ELWA, Dr. Van Reken advocated evacuation and offered to accompany the child. However, Dr. Lefton retained the

final authority to approve evacuation, despite his withdrawal from decisions about Nyenpan's medical care.[6] Defendants produced no evidence explaining or otherwise giving any reason why Dr. Lefton waited until June 17 to approve evacuation.[7] It is more likely than not that, even if Nyenpan could not have been evacuated on June 5, he could have been evacuated much earlier than June 17. However, because he was probably beyond hope of recovery earlier than June 17 and perhaps as early as June 6, defendants failure to evacuate him between June 6 and June 17 did not cause his injuries.

D. The State Department's Role

1. State Department Policy

Plaintiffs allege that the Department of State in Washington, D.C. failed to provide the level of medical care promised in its policy manuals. The Uniform State/AID/USIA Regulations establish medical policies, benefits, and procedures for both employees and Regional Medical Officers such as Dr. Lefton in the field, as well as the Office of Medical Services (also referred to as M/MED) and other organizations in the United States. As noted, the Uniform State/AID/USIA Regulations provide that the State Department's general policy is "to assist all American employees and their dependents in obtaining the best possible medical care ... so that no employee need

---

6. On June 17, Tarpeh–Doe visited the embassy. That day, not aware that evacuation already had been approved, she inquired of Alan Swan, the AID Executive Officer, when evacuation would be approved. He told her that no date had been scheduled. Later that day, she encountered Clement, who informed her that she was making arrangements to accompany Nyenpan's evacuation that evening as a medical attendant. Tarpeh–Doe went immediately to Dr. Lefton, who confirmed the evacuation. Swan later told Tarpeh–Doe that Dr. Lefton had asked him not to tell the Tarpeh–Does that their evacuation had been approved that day. Tarpeh–Doe dep. at 108–09.

7. Plaintiffs presented some circumstantial evidence raising the suspicion of an improper reason, i.e. that the evacuation was postponed until a replacement could be found for Tarpeh–Doe's supervising officer. As an accountant, Tarpeh–Doe worked for the Acting Comptroller in Monrovia. Only Tarpeh–Doe and the Acting Comptroller were authorized to certify AID vouchers.

Certification of vouchers was required for processing of all AID checks, including payroll checks. (Testimony of Tarpeh–Doe); Petrone dep. at 15–16. Following a going away party, the acting Comptroller left Monrovia on June 5, 1982, on the 11:00 p.m. flight on which Dr. Lefton had first planned to evacuate Nyenpan. During Nyenpan's illness, Tarpeh–Doe certified all AID vouchers, which were brought to her at ELWA on many days so that she could remain at her son's bedside. (Testimony of Tarpeh–Doe). A new certifying official arrived in Liberia on the morning of June 18, 1982. Defendants did not present any evidence in contravention of the obvious damaging conjectures that can be drawn from these facts. Nevertheless, plaintiffs do not urge a finding that the State Department purposely delayed evacuation of a severely ill child for over ten days until a certifying official could be brought in to certify checks.

hesitate to accept an assignment to a post where health conditions are hazardous, medical service poor, or transportation facilities limited." 3 FAM § 681.2.; Pls. ex. 59. The Medical Director of the Office of Medical Services in Washington is responsible for directing, managing, and supervising the medical and health program and operations. *See* 3 FAM § 681.6(j), Pls. ex. 35, (effective June 16, 1972); § 681.6(k) (effective March 11, 1985), Pls. ex. 59; Korcak dep. at 10.

The State Department provides Regional Medical Officers as a benefit of employment in locations where local medical services are poor, because it would be difficult to find people to serve in many areas of the world without medical support. *Id.* at 14. In 1982, the Department employed 39 Regional Medical Officers (not including psychiatrists). *Id.* at 10. In addition to their responsibility for the provision of "medical care, counsel and examinations for American employees and their dependents," § 682.2–2(a)(1), Medical Officers must "[m]aintain liaison with Post Medical Advisors, local physicians, hospitals, laboratories, and public health officials on matters pertinent to the Department of State medical program." § 682.2–2(a)(3). One of the Medical Officer's duties, where medical care is not up to United States standards, is to be aware of conditions at local facilities in order to be able to advise employees which local facilities to use. Korcak dep. at 15; (testimony of Goff).

Officials of the Office of Medical Services claim that it is impractical, if not impossible, for the Office in Washington, D.C., to supervise the daily activities of Regional Medical Officers in the field. (Testimony of Korcak, Goff). Nonetheless, Regional Medical Officers normally consult the Office of Medical Services in cases involving serious medical problems. Korcak dep. at 29. Indeed, the Uniform State/AID/USIA Regulations require such consultation: "The Department of State principal officer, medical officer, or nurse, *will* report telegraphically by 'MED CHANNEL' ... to the Deputy Assistant Secretary for Medical Services (M/MED) each serious illness or injury of employees or their de-

pendents." 3 FAM § 682.2–8 (emphasis added). The Regulations further provide: "The advice of a Department of State medical officer or the Office of Medical Services (M/MED) may be requested at any time. It should be obtained in all cases where there is doubt as to the need for the treatment recommended by another physician...." *Id.* at § 685.4–1.

Moreover, Regional Medical Officers generally obtain approval from the Office of Medical Services for evacuations. Thus, the Uniform State/AID/USIA Regulations provide:

> Eligible American employees or dependents who are unable to obtain suitable medical care abroad for an overseas-incurred illness or injury may be authorized by the post to receive medical care in U.S. facilities. ... In such cases, the post shall telegraph in advance via "MED CHANNEL" ... to give the diagnosis and to request instructions from the Deputy Assistant Secretary for Medical Services (O/MED). In emergency situations where the well-being of the employee precludes prior consultation with O/MED, the delegated officer at post ... may authorize travel to Washington, D.C., but shall immediately inform O/MED the reason for the evacuation, give the date and mode of arrival, and request that arrangements for hospitalization be made.

. . . . .

*Id.* at § 685.4–2. Finally, the Regulations provide that "[a]ny American Foreign Service employee or any of his dependents ... who require medical care for illness or injury ... while located or stationed abroad in a locality where there is no qualified person or facility to provide such care ... *shall* be eligible to travel at Government expense to the nearest facility where suitable care can be obtained, whether or not the medical care is at Government expense." 3 FAM § 686.1 (emphasis added). The Regulations thus demonstrate that, even though the Office of Medical Services is unable practically to supervise the day-to-day decisions of Regional Medical Officers in the field,

the Office strongly requires, or at least recommends and strongly supports, close communications during medical emergencies.

## ii. State Department Actions

Despite the regulations described above, the Office of Medical Services had very little contact between June 5 and June 17, 1982 with Dr. Lefton or anyone else in Monrovia regarding Nyenpan Tarpeh–Doe's illness. On June 5, when the Tarpeh–Does first brought Nyenpan to the embassy health unit and Dr. Van Reken discussed evacuation with them, Tarpeh–Doe requested that Petrone contact Tarpeh–Doe's mother, Marilyn Wheeler, to attempt to arrange a receiving physician for the evacuation. On the afternoon of June 5, Petrone phoned Wheeler, informed her that Nyenpan was seriously ill, and asked her to find a receiving physician in Colorado for Nyenpan's evacuation. On June 5 or 6, Wheeler located a neonatologist at the University of Colorado, Dr. Gerhardt Schroeter, who agreed to serve as receiving physician. Dr. Schroeter told Wheeler that he thought it was essential that he speak to the attending physician in Liberia as soon as possible. Wheeler was unable to phone Liberia directly, and so on Saturday or Sunday, June 5 or 6, she contacted the State Department in Washington, using a list of telephone numbers given to her by her daughter. She first called a medical emergency number. The person who answered that call referred her to the Liberian desk. She informed a person there that she had received a call about the evacuation and been asked to locate a receiving doctor and hospital. She identified the doctor and hospital and relayed the message that Dr. Schroeter thought it was imperative that he speak with the attending physician. She was told that they were not aware of the planned evacuation. At some point, she was told they had sent a cable, but that the telephone was not working. Wheeler did not receive a copy of the cable and did not hear again from the State Department until she received notice of the June 17 evacuation. Then, she again contacted Dr. Schroeter and arranged for an ambulance to meet the arriving family at the Denver airport.

In response to Marilyn Wheeler's June 5 or 6 telephone message to the State Department that she had arranged for a receiving physician in preparation for evacuation, the State Department sent a cable over "MED CHANNEL" to Liberia. That cable, dated June 7, stated:

1. M/MED INFORMED VIA TELEPHONE CALL FROM SUBJECT'S MOTHER THAT THE NEONATAL CENTER AT UNIVERSITY OF COLORADO WILL ACCEPT MRS. WHEELER AND INFANT. POINT OF CONTACT IS DR. GERHARDT SCHROTER [sic], TELEPHONE (303) 199–1211.

2. TODATE [sic] M/MED UNAWARE OF THE ABOVE NEED. PLEASE ADVISE ASAP.

*See* Pls. ex. 39. In response, on June 8, a cable from the embassy in Liberia stated:

1. SUBJECT BECAME ILL 3 JUNE 1982 PRESENTING WITH POOR SUCK, TEMPERATURE ELEVATION, LETHARGY, IRRITABILITY, STAPH LESSIONS [sic] OVER PERINEUM AND BUTTOCKS. MOTHER WHO HAD BEEN BREAST FEEDING WAS BEING TREATED BY LOCAL PHYSICIAN FOR BREAST ABSCESS.

2. SPINAL FLUID POS FOR STAPH LIKE ORGANISM. SUBJECT IN ELWA HOSPITAL ON PENICILLIN AND CHLORAMPHENICOL. SEIZURE [sic] HAVE SUBSIDED. SUBJECT RECEIVING ANTICONVULSIVE MEDS.

3. CONDITION STABILIZING. WOULD PLAN TO MOVE SUBJECT AT TIME WHEN PARENTERAL THERAPY COMPLETED. EARLIEST WOULD BE 13 JUNE.

4. SUBJECT HAS CONTACTED HER PARENTS IN DENVER AREA REGARDING ACCEPTING FACILITY. SUBJECT WILL NEED CARE OF NEONATOLOGIST REGARDING CNS PROBLEMS. SPONSOR DESIRES TO

COST CONSTRUCT DENVER IN LIEU OF FRANKFURT. PLS ADVISE.

*Id.*

A return cable from the Department of State to the Liberian embassy dated June 9 stated:

1. THE MEDICAL DIRECTOR AUTHORIZES MEDICAL TRAVEL OF SUBJECT TO DENVER, COLORADO ON COST CONSTRUCTION BASIS MONROVIA / FRANKFURT / MONROVIA.

2. MEDICAL CLEARANCE ANNULLED PENDING OUTCOME OF EVALUATION AND TREATMENT.

3. WILL SCHEDULE APPOINTMENTS WHEN DEFINITE ETA KNOWN.

4. CONTACT FOR REINSTATEMENT OF MEDICAL CLEARANCE AND ADMINISTRATIVE ASSISTANCE IS DR. HUNGERFORD OR DR. KEARY. 202–632–8122.

*Id.* There is no evidence of further communication until June 16, when the Liberian embassy cabled the State Department that:

1. SUBJECT NOW STABLE ENOUGH TO TRAVEL TO NEONATAL INTENSIVE CARE UNIT AT U. OF COLORADO

. . . .

4. AS YET HAVE NOT RECEIVED RESULTS OF CIE ON SUBJECT'S SPINAL FLUID OR BLOOD THAT WAS HAD CARRIED TO M/MED LAST WEEK. WOULD APPRECIATE KNOWING ORGANISM.

Pls. ex. 39. Dr. Lefton recalled communicating with the Department of State by telephone during this time. Lefton dep. at 110. However, he could not remember with whom he spoke or what he discussed. There was no evidence of any contact regarding Nyenpan's illness between the Office of Medical Services in Washington, D.C. and any person in Liberia beyond that described in the cables above.

### E. Tarpeh–Doe's Benefits

Plaintiffs claim that the State Department never informed Tarpeh–Doe that her medical benefits included the option to evacuate to deliver her child in Europe or the United States. Plaintiffs assert that, had she been informed, she would have taken advantage of that benefit and delivered her child in the United States, where bacterial infection is less prevalent and medical care is more advanced. Tarpeh–Doe testified that she was never told and did not know of that right. However, defendants produced evidence to the contrary.

As part of employee training, Gertrude Slifkin presents a lecture on employee relations and insurance. She includes in her lecture information about the State Department policy regarding evacuation of pregnant women for delivery of their children. (Testimony of Slifkin). Tarpeh–Doe attended that lecture on December 30, 1980, the second day of her nine week training course in Washington prior to travelling to Monrovia. *See* Tarpeh–Doe's lecture notes, Pls. ex. 27 at 6. However, she does not recall mention of this benefit in the lecture, nor did she record such mention in her lecture notes. *See id.* Slifkin did not recall the particular lecture attended by Tarpeh–Doe.

Alfreda Mitchell, a nurse assigned to the embassy health unit in Monrovia who was present when the Tarpeh–Does visited Dr. Lefton in September, 1981 so that Ben could receive tests in preparation for their marriage, heard Tarpeh–Doe tell Dr. Lefton that she was pregnant. Mitchell recalled overhearing Dr. Lefton tell Tarpeh–Doe in response that she should evacuate for delivery. (Testimony of Mitchell). Tarpeh–Doe did not recall that Dr. Lefton so informed her. Moreover, Dr. Lefton did not testify that he so informed her. He stated that he was not aware of any other American mother who had delivered a child in Liberia. *See* Lefton dep. at 131. He also stated that a decision by a pregnant woman not to evacuate for delivery would have been reported on the woman's medical chart. *Id.* at 133. No such decision was recorded on Tarpeh–Doe's chart. From 1969–1972, when Dr. Eben H. Dustin, Director of Medical Services at the State De-

partment in 1988, was Regional Medical Officer in Monrovia, Liberia, no woman delivered her first child in Monrovia. Dustin dep. at 55. When Dustin was Regional Medical Officer in Monrovia, he discussed evacuation with every pregnant woman. *Id.* at 57.

While the evidence described above is not conclusive, defendants produced additional evidence indicating that Tarpeh–Doe did not evacuate to deliver her child because she could not afford to forego pay during the time she would be required to be absent from her position in order to do so. The airlines and the State Department require pregnant women who want to deliver a child elsewhere to leave their overseas post six weeks prior to their scheduled delivery date and remain away for six weeks following delivery. Maternity benefits include reimbursement for travel and medical expenses for pregnant women who chose to evacuate to deliver their children but do not include paid leave for the twelve weeks a woman must be away from her post. Thus, unless a woman has otherwise accumulated twelve weeks of paid leave, she must take leave without pay to take advantage of this "benefit." Petrone recalled asking Tarpeh–Doe why she didn't go home to have the baby. Tarpeh–Doe responded that she couldn't afford to do so. Petrone dep. at 16–17. However, Gertrude Slifkin testified that when Tarpeh–Doe visited her to discuss medical benefits upon her return to the United States with Nyenpan, while the two walked across the street to the medical division, Slifkin asked Tarpeh–Doe why she had delivered her baby in Liberia. Tarpeh–Doe responded that she did not want to be away from post and that she did not have enough accumulated leave to receive pay during her time away. (Testimony of Slifkin).

Therefore, the evidence does not clearly establish when and how defendants informed Tarpeh–Doe that her benefits included the right to evacuate for delivery, albeit without pay. But Slifkin's recollection of Tarpeh–Doe's expressed reason for not evacuating to deliver her child indicates that it is more likely than not likely that Tarpeh–Doe, though she may not have

been aware of specific details of the options available to her for evacuation, was generally aware that evacuation was a possibility but that she could not afford it. No evidence was adduced that any person informed her of the potential risks of delivery in Liberia, of the risks to neonates in Liberia, or of the prevalence of infectious diseases there.

## II.

### A.

This Court has jurisdiction over a claim against the United States for personal injury caused by the negligence of a governmental employee acting within the scope of employment. The Court's jurisdiction extends to "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The relevant acts and omissions, if any, took place in the District of Columbia. Therefore, District of Columbia tort law determines whether defendants are liable for plaintiffs' claims.

### B.

Defendants argue that the discretionary function exception to the Federal Tort Claims Act deprives the Court of jurisdiction here. The discretionary function exception exempts from the FTCA any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The Supreme Court has clarified the application of this provision as follows: First, whether an act or omission constitutes a discretionary function is determined by "the nature of the conduct, rather than the status of the actor...." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)* 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660, *reh. denied,* 468 U.S. 1226, 105 S.Ct. 26, 82 L.Ed.2d 919 (1984). Second, the exception covers only

actions that involve "an element of judgment or choice." *See Berkovitz v. United States,* 486 U.S. 531, 536–37, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988); *Dalehite v. United States,* 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953). Finally, the exception applies only to "government actions and decisions based on considerations of public policy." *Berkovitz,* 486 U.S. at 537, 108 S.Ct. at 1959. Thus, "[w]here there is room for policy judgment and decision there is discretion." *Dalehite,* 346 U.S. at 36, 73 S.Ct. at 968. If regulations provide specific directions, therefore, an employee's failure to follow those directions is not protected by the discretionary function exception. *Berkovitz,* 486 U.S. at 542–43, 108 S.Ct. at 1961–62. For example, the Coast Guard's failure to ensure that a light bulb at a lighthouse was operational did not involve a permissible exercise of policy discretion. *See id.* at 538 n. 3, 108 S.Ct. at 1959 n. 3, discussing *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

The Supreme Court has recently clarified the discretionary function exception. *United States v. Gaubert,* —— U.S. ——, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). The plaintiff in *Gaubert* pursued a tort claim against the Federal Home Loan Bank Board arising out of its supervision and day-to-day management of a thrift unit, the Independent American Savings Association. The Fifth Circuit, distinguishing between policy-making decisions and operational ones, determined that the discretionary function exception did not apply to the agency's intervention in day-to-day affairs. The Supreme Court disagreed and held that the discretionary function exception applies to operational decisions as well as policy and planning decisions. *Id.* 111 S.Ct. at 1275. Describing the exception, the Court explained that

> if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy. On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.
>
> Not all agencies issue comprehensive regulations, however. Some establish policy on a case-by-case basis, whether through adjudicatory proceedings or through administration of agency programs. Others promulgate regulations on some topics, but not on others. In addition, an agency may rely on internal guidelines rather than on published regulations. In any event, it will most often be true that the general aims and policies of the controlling statute will be evident from its text.
>
> When established governmental policy, as expressed or implied by statute, regulation or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion.

*Id.* 111 S.Ct. at 1274 (citations omitted). The Court further stated:

> There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish.

*Id.* 111 S.Ct. at 1275 n. 7.

Therefore, defendants are protected by the discretionary function exception if their allegedly negligent acts or omissions involved an exercise of choice or judgment that conformed with the purposes of the State Department's medical policy. With respect to plaintiffs' claim that defendants failed to inform Tarpeh–Doe that her benefits included the option to deliver her child outside of Liberia, any failure to inform was not based on a permissible exercise of discretion because the State Department's medical policy can in no way be furthered

by a judgment that employees should not be informed about their benefits. Similarly, neither defendants' failure to transmit Marilyn Wheeler's message from Dr. Schroeter that he felt it was imperative that he speak with the treating physician, nor defendants' failure to conduct the requested test on the sample of Nyenpan's spinal fluid sent to Washington, D.C., involved any permissible exercise of choice in conformance with the State Department's medical policy or any other public policy. That conduct more closely resembles an employee's failure to follow the directions specified in regulations in *Berkovitz* or the Coast Guard's failure to replace a light bulb in *Indian Towing. See Berkovitz,* 486 U.S. at 538 n. 3 & 542–43, 108 S.Ct. at 1959 n. 3 & 1961–62.

In contrast, Korcak's participation in the decision to retain Dr. Lefton for part of the time it took to locate a replacement for him involved consideration of factors that conformed to the State Department's medical policy. The Medical Director is charged with providing medical officers in the field as well as removing medical officers who are unable to perform their responsibilities. Swing and Korcak jointly decided to curtail Dr. Lefton's assignment in Monrovia but to permit him to remain at post for several more months. One of the reasons for that decision—permitting Dr. Lefton to remain in Monrovia so that his daughter could proceed as planned to visit him in August, 1982—did not involve any permissible exercise of judgment related to the State Department medical policy. However, the decision was also based on an attempt to minimize the gap between Dr. Lefton's departure and the arrival of a replacement physician, taking into account the potential risks of leaving the post without a physician assigned there. Consideration of those factors is protected by the discretionary function exemption. No evidence established the degree to which each reason affected the decision. But the presence of protected considerations renders the entire decision immune. Accordingly, defendants are protected by the discretionary function

exception from plaintiffs' claim that they negligently retained Dr. Lefton in Monrovia.

Nevertheless, defendants had a self-imposed responsibility under State Department regulations to supervise the provision of medical services by whomever they retained in Monrovia. *See, e.g.,* 3 FAM §§ 681.2 & 685.4–1 & 4–2, Defs. ex. 1. Defendants' failure to supervise Dr. Lefton more closely even after the inspectors alerted defendants to Dr. Lefton's flagrant derelictions of his official and professional responsibilities [8] was not a permissible exercise of choice or discretion; that failure involved *no decision.* When defendants permitted Dr. Lefton to remain at post for several months, they conspicuously failed to consider and to make any decision about enhanced supervision of Dr. Lefton in light of the manifestly increased risks to which they exposed State Department personnel in Monrovia by not replacing or reinforcing him. Thus, there is no evidence that defendants' lack of response was the result of *any* exercise of choice or judgment, much less a permissible choice or judgment based on State Department medical policy. The discretionary function exemption therefore does not apply to defendants' failure to supervise Dr. Lefton more closely.

### III.

#### A.

To prove a tort claim under District of Columbia law, plaintiffs must show (1) a duty owed to plaintiffs by defendants; (2) a breach of that duty; and (3) an injury to plaintiffs proximately caused by defendants' breach of duty. *See, e.g., District of Columbia v. Fowler,* 497 A.2d 456, 462 n. 13 (D.C.1985); *Morrison v. MacNamara,* 407 A.2d 555, 560 (D.C.1979).

#### B.

█ Plaintiffs contend that defendants had the duty to provide Tarpeh–Doe and her dependents with "the best possible medical care," as provided in Uniform State/USIA/AID Regulations. 3 FAM

---

**8.** *See also infra,* section III–E, pp. 61–63.

§ 681.2. Federal regulations do not establish a duty by the government in the absence of an analogous cause of action under local tort law. *See, e.g., Art Metal–U.S.A., Inc. v. United States,* 753 F.2d 1151, 1157 (D.C.Cir.1985). Where an analogous duty is recognized under local law, however, federal regulations provide evidence that the government has assumed such a duty, as well as evidence of the standard of care assumed. *Id.* at 1158. Plaintiffs argue that defendants voluntarily assumed the duty to provide Linda and Nyenpan with "the best possible medical care." Plaintiffs also contend that defendants assumed that duty as part of their special relationship with her. Plaintiffs further contend that defendants established that duty by publishing it in regulations and manuals. District of Columbia courts have found duties to exist in all of these circumstances. *See, e.g., Arnold's Hofbrau, Inc. v. George Hyman Constr. Co.,* 480 F.2d 1145, 1148 (D.C.Cir.1973) (voluntary assumption of duty); *Kline v. 1500 Massachusetts Ave. Apartment Corp.,* 439 F.2d 477, 482–83 (D.C.Cir.1970) (special relationship, including employer-employee relationship); *Lucy Webb Hayes Nat. Training School v. Perotti,* 419 F.2d 704, 710 (D.C.Cir.1969) (duty based on normal practices as well as internal procedures or manuals).

Courts have also found that an employer's employment manuals are relevant to determining the terms of the employment contract. *See, e.g., Washington Welfare Assoc. v. Wheeler,* 496 A.2d 613, 615 (D.C.1985). The terms of a contract between parties, in turn, may in some circumstances help to define whether a defendant owes a duty to a plaintiff. *See, e.g., Kline, supra,* 439 F.2d at 481–82. The State Department not only defines its medical policy as assisting all employees in obtaining the best possible care, it defined the reason for that policy: "so that no employee need hesitate to accept an assignment to a post where health conditions are hazardous, medical service poor, or transportation facilities limited...." 3 FAM § 681.2. This explanation, supported by Korcak's testimony that it would be difficult to find employees to serve in certain areas of the world without medical support, indicates that defendants viewed the provision of enhanced medical services as a part of the employment contract—in consideration for which employees accepted assignments at medically risky posts. Reliance on those services by employees who accept a position for overseas service is highly likely. Reliance by plaintiffs is one factor D.C. courts have considered in finding a duty to exist under tort law based on a special relationship. *See, e.g., Morgan v. District of Columbia,* 468 A.2d 1306, 1313–14 (D.C.1983) (en banc).

In addition, actual or constructive notice of dangerous conditions is relevant to whether there is a duty. *See, e.g., id.* at 481 & 483; *District of Columbia v. Fowler,* 497 A.2d 456, 461 (D.C.1985). Here, the State Department had actual notice of Dr. Lefton's lack of availability and of his refusal to respond to serious medical situations on several occasions in the past as well as the diseases which lurked in Monrovia. Moreover, the Foreign Affairs Statute provides that an action against the United States under the FTCA is the exclusive remedy for a claim for damages for personal injury allegedly arising from the negligence of "supporting personnel of the Department of State in furnishing medical care or related services...." 22 U.S.C. § 2702(a); *see also United States v. Smith,* —— U.S. ——, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991). That statute thus anticipates tort liability for any negligent acts by Department of State employees related to the provision of health care. For all of these reasons, the State Department owed a duty to plaintiff to provide her with a level of medical care higher than that available from local facilities in Liberia. Defendants promised Tarpeh–Doe "the best possible medical care." Although federal regulations provide some evidence of the standard of care to be applied, District of Columbia law also provides that the standard of care in negligence cases is "reasonable care under the circumstances." *See, e.g., Morrison v. MacNamara,* 407 A.2d 555, 560 (D.C.1979).

## C.

■ Plaintiffs' claim that the State Department failed to inform Tarpeh–Doe of her right to evacuate to deliver her child must fail. As described above, the facts do not support Tarpeh–Doe's contention that she was not informed. Accordingly, even if defendants had a duty to inform her, plaintiffs fail to show a breach of that duty. Plaintiffs' claim that the Office of Medical Services failed to conduct the correct laboratory test on the CSF sample sent to Washington, D.C. on June 10, 1982 also must fail. To the extent that the Office of Medical Services offered to perform tests on samples sent to Washington, D.C., it had a duty to plaintiff to competently perform those tests. However, since Nyenpan's injuries were more likely than not likely irreversible by June 10 when a CSF sample was sent for a CIE test to the Office of Medical Services in Washington, D.C., any negligence by the Office of Medical Services in conducting the wrong test is unlikely to have caused Nyenpan's injuries.

## D.

■ Plaintiffs also claim that defendants negligently failed to relay a message from Dr. Schroeter that he felt it was imperative that he speak with the treating physicians as soon as possible.[9] By assuming responsibility for the provision of medical care and by accepting Wheeler's message, defendants had a duty to accurately relay that message. Defendants did not refute whether the message was relayed; thus, they breached that duty.

The more difficult question is whether that breach was the cause of Nyenpan's injuries. A defendant's conduct must be a "substantial factor" in causing a plaintiff's harm to support a finding of proximate cause. *See, e.g., Lacy v. District of Columbia*, 424 A.2d 317, 319–21 (D.C.1980). Had Dr. Lefton or Dr. Van Reken received Dr. Schroeter's message and called him— and had Dr. Schroeter offered advice upon which they could have more effectively treated the baby, all prior to the point at which the baby was beyond hope of recovery, perhaps the infant would have recovered. However, this chain of causation is too attenuated to support a finding that defendants' failure to relay the message was a substantial factor in bringing about the injuries. The facts and inferences to be drawn from them indicate that the State Department in Washington delayed transmission of the first telegram (absent the message that Dr. Schroeter wanted to speak with the treating physicians) for approximately two days, until June 7.[10] But because Nyenpan was likely beyond hope of recovery by June 6, it is unlikely that communication after that date could have served to help him. Furthermore, telephone communication between Liberia and the United States was not always possible.[11] Moreover, no expert testified that if

9. Defendants argue that Dr. Schroeter's message was hearsay and should be excluded from evidence. However, that evidence is not admitted for the truth of the assertion. Marilyn Wheeler testified that she gave that message to an operator at the State Department. Moreover, whether advice from a specialist, particularly a neonatologist familiar with infectious diseases, might have led to improved care and Nyenpan's recovery is not dependent on accepting the truth of Dr. Schroeter's assertion.

10. Marilyn Wheeler did not recall whether she called the State Department with her message on Saturday, June 5, or Sunday, June 6. However, for several reasons, it is more likely than not likely that she relayed the message on June 5. When Kate Jones Petrone first telephoned Wheeler to request that she arrange for a receiving physician, it was afternoon in Liberia. Therefore, it was seven hours earlier in Colorado, very likely early in the morning of June 5.

It is likely that Petrone would have informed Wheeler that the evacuation was scheduled to take place at 11:00 p.m. that evening, June 5. It is also likely that Wheeler would have recognized the urgency of the situation and made every attempt to locate a receiving physician that day. The State Department did not relay Wheeler's message to Liberia until Monday, June 7. Accordingly, if that message were received on the afternoon of June 5, not only did no one relay the portion of the message that Dr. Schroeter wanted to speak with the treating physicians, no acted at all on that message for two days—over the weekend.

11. Kate Jones Petrone succeeded in contacting Marilyn Wheeler by telephone on June 5. However, after Wheeler contacted the State Department, someone informed her that the cable had been sent on June 7 but that they could not contact personnel in Liberia by telephone. (Testimony of Wheeler).

Dr. Schroeter had spoken with Dr. Lefton or Dr. Van Reken he could have offered advice that would have led to Nyenpan's recovery. As a result, plaintiffs' claim that defendants' failure to relay Dr. Schroeter's message caused the infant's injuries cannot succeed.

### E.

■ Plaintiffs allege that defendants negligently failed to supervise Dr. Lefton. District of Columbia courts recognize such a claim of negligent supervision. *See International Distributing Corp. v. American District Telegraph Co.*, 569 F.2d 136, 139 (D.C.Cir.1977); *Kendall v. Gore Properties, Inc.*, 236 F.2d 673 (D.C.Cir.1956); *Anderson v. Hall*, 755 F.Supp. 2, 5 (D.D.C.1991); *Murphy v. Army Distaff Foundation, Inc.*, 458 A.2d 61 (D.C.1983). A finding of negligent supervision does not require a finding that the tort was committed in the principal's interest, as does a finding of negligence on a theory of *respondeat superior* in the District of Columbia. *See International Distributing*, 569 F.2d at 139; *Lyon v. Carey*, 533 F.2d 649, 651 (D.C.Cir.1976). Instead, to define negligent supervision claims, District of Columbia courts cite with approval the criteria listed in § 213 of the Restatement (Second) of Agency (1957):

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>
> (a) in giving improper or ambiguous orders or in failing to make proper regulations; or
>
> (b) in the employment of improper persons or instrumentalities in work involving risk or harm to others; or
>
> (c) in the supervision of the activity; or
>
> (d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his services or agents, upon premises or with instrumentalities under his control.

*See, e.g., International Distributing Corp.*, 569 F.2d at 139; *Anderson*, 755 F.Supp. at 5; *Murphy*, 458 A.2d at 63–64. Foreseeability is one factor considered by D.C. courts in imposing liability for negligent supervision. *See, e.g., Kline v. 1500 Massachusetts Ave. Apartment Corp*, 439 F.2d at 483. But foreseeability is not required—a defendant may be liable unless the "chain of events appears 'highly extraordinary' in retrospect." *Lacy v. District of Columbia*, 424 A.2d 317, 319–20 (D.C.1980).

■ The facts and circumstances here support a finding of negligent supervision. First, defendants were on notice of Dr. Lefton's unavailability. Defendants knew that Dr. Lefton's unavailability was not the result of other commitments or responsibilities but was instead the result of Dr. Lefton's unwillingness to provide medical care. The complaints from employees, relayed directly to both Beahler and Korcak from the inspectors, indicate that Dr. Lefton's reluctance to perform his duties went beyond the specific incidents described and extended to his patients' daily problems locating him, getting messages to him, and receiving any medical care after daytime, weekday, hours. Furthermore, defendants knew that Dr. Lefton had left the post repeatedly for personal travel, had refused to make house calls, and had refused to travel to administer medical care. Once Dr. Lefton's assignment had been curtailed, his supervisors should have recognized that his commitment to his responsibilities was unlikely to increase and was, if anything, likely to dwindle yet further. Ambassador Swing may have realized this when he expressed to Korcak his concern for adding the provision of medical services to Dakar to Dr. Lefton's responsibilities during the summer. Korcak, however, dismissed these concerns. Unwilling to be dissuaded from his positive impression of Dr. Lefton, Korcak discouraged Swing from his attempts to curtail Dr. Lefton's assignment in Monrovia and encouraged Dr. Lefton to seek further extensions of his stay in Monrovia. The situation was rife with the potential for a serious mishap resulting directly from Dr. Lefton's inaction. A doctor's inaction, in addition to a doctor's actions, can constitute malpractice—a doctor who fails to provide needed medical services to a patient with whom

452

that doctor has a professional relationship may be liable for abandonment unless the doctor is replaced by an equally qualified physician. *See Ascher v. Gutierrez*, 533 F.2d 1235, 1236 (D.C.Cir.1976). The evidence indicates that Dr. Lefton's supervisors at the Office of Medical Services failed to appreciate, or even to consider, the risk of serious medical problems likely to arise from Dr. Lefton's reluctance to provide care. Accordingly, defendants breached their duty to Tarpeh–Doe.

 Dr. Lefton's negligent actions and omissions proximately caused Nyenpan's injuries. Dr. Lefton did not administer or in any way supervise or check on any gynecological, prenatal, or obstetrical care to Linda Wheeler Tarpeh–Doe despite her manifest need for such care. Instead, he referred her to a local gynecologist and obstetrician for care for a period of over nine months without advising her that she should or could call him if she needed advice, without arranging to see her even once to determine whether she was receiving adequate local care, and without inquiring about her care of her treating physicians. He did not inform her of the known risks of delivery and post-natal care of a child, particularly a first child, in disease-ridden Monrovia. He never alerted her to the conditions of the various clinics and hospitals in Monrovia, some of which were evidently notorious. He did not visit her upon or after her delivery. When she became sick on Thursday, June 3, and needed prompt attention at 10:00 p.m. he was unavailable for unexplained reasons—the likely inference being that he refused to make a house call as he had refused several times in the past. When Tarpeh–Doe visited Dr. Lefton for treatment for mastitis on Friday, June 4, Dr. Lefton did not examine, or even ask about, the child. He advised her at that time to resume breast feeding. That advice, if followed, could have caused or increased the child's exposure to infectious bacteria. When the Tarpeh–Does came to Dr. Lefton on June 5, he did not administer any tests. Dr. Lefton considered, but decided against, attempting to evacuate the child by commercial airplane. He did not request the services of a MAC

flight for evacuation. He handed over all care to Dr. Van Reken, a physician to whom he had never referred a patient before. He permitted Dr. Van Reken to admit Nyenpan into a local hospital with deplorable conditions at a critical point in the baby's care—against the baby's parents' vehement objections. He was not familiar with the conditions at JFK, despite his duty to be aware of conditions at local health facilities in order to advise State Department and AID employees where to safely obtain services. He did not visit or inquire about his American charges at JFK hospital during the initial afternoon of June 5, nor did he visit or inquire that night or the next morning. He never evaluated its facilities for himself to determine whether the parents' pronounced fears were justified. He did not check to see whether medications, or oxygen, or 24-hour care by doctors or other trained medical attendants, would be available there. He did not contact the Office of Medical Services immediately to request advise or support from a neonatologist or an expert in bacterial spinal meningitis in the United States. Moreover, he did not cable the Office of Medical Services until he received a brief request for information from them. When he did cable the Office, he did not inform persons there that he had not examined the child since June 5 nor that he had turned over care to Dr. Van Reken, nor did he request assistance or advice. He did not visit Tarpeh–Doe until June 12. After the June 5 visit to him at the embassy health clinic, he did not examine the baby at all. He did not authorize evacuation either upon the parents' repeated requests or upon Dr. Van Reken's approval of evacuation.

In short, Dr. Lefton washed his hands of Linda Wheeler Tarpeh–Doe and her baby and turned his back on them, doing as little as possible to attend to Tarpeh–Doe's care during pregnancy or to plan for the close medical supervision of mother and child after delivery. He was supposed to be the family doctor. Had Dr. Lefton provided Tarpeh–Doe with gynecological or prenatal care or taken any interest at all in her

condition by anticipating and preparing himself and herself for the risks awaiting the mother and child after delivery, he would have visited her or otherwise made himself available so that she would have automatically called or visited him with the child on Friday, or even Thursday, when she first noticed signs of illness. Had she felt that he would willingly, rather than reluctantly, attend to her medical needs, she would have sought him out instead of waiting until Nyenpan required emergency care and seeking that care from local, inadequate, facilities. On June 5, had Billie Clement not directed the Tarpeh–Does to the embassy health unit, it is even possible that Nyenpan would have received better care from Dr. Johnson at Cooper's Clinic than he received from Dr. Lefton who permitted Dr. Van Reken to place him in a hospital with roaches and rats and with no medications, no medical attendants during the night, and no oxygen. From Tarpeh–Doe's arrival in Monrovia throughout her pregnancy, delivery, and, most important, from the onset of the post-natal illness of mother and child, Dr. Lefton took none of the initiatives required of him by the State Department directives or by any conceivable standard of care for a physician in his circumstances.

Dr. Lefton's acts and omissions render it difficult to determine with any degree of certainty the true cause of the infant's failure to recover. D.C. courts have established that where a defendant's acts or omissions create uncertainty as to whether, had the defendant acted otherwise, the outcome would have been more favorable to the plaintiff, that uncertainty does not provide a defense against the plaintiff's showing of proximate cause. *See, e.g., Daniels v. Hadley Memorial Hospital*, 566 F.2d 749, 757 (D.C.Cir.1977); *Ascher v. Gutierrez*, 533 F.2d 1235, 1238 (D.C.Cir.1976). It is more likely than not likely that improved pre- and post-natal care for Linda and Nyenpan, advice for sanitary precautions, or earlier treatment for Nyenpan would have averted this tragedy and/or resulted in the child's full recovery. Dr. Lefton was responsible for failing to provide that earlier advice and treatment. Therefore, plaintiffs have shown by a preponderance of the evidence that Dr. Lefton's conduct, in particular his omissions, were a substantial factor in causing Nyenpan's injuries.

■ The ultimate question remains whether defendants are liable for "permitting, or failing to prevent" Dr. Lefton's negligence. Restatement (Second) of Agency § 213. Defendants argue that it would have been impossible for the Office of Medical Services to participate in decisions regarding Nyenpan's care. This contention is controverted by defendants' own regulations. The Uniform State/AID/USIA Regulations require the Office of Medical Services to support Regional Medical Officers in serious medical emergencies that take place in foreign countries, to receive notification of medical emergencies, and to authorize evacuations. Dr. Lefton could and should have instantly communicated with Washington. Additionally, while 3 FAM § 681.2 provides that post officers "are cautioned to be alert to any medical and health problems of employees and their dependents and to take appropriate action promptly," only medical officers at the Office of Medical Services in Washington had the medical expertise required to predict the risk of medical emergencies stemming from Dr. Lefton's failure to provide services. Therefore, Dr. Lefton's negligent acts and opinions were under defendants' control. *See* Restatement (Second) of Agency § 213(d).

Moreover, Dr. Lefton's lack of care could have and should have been foreseen by the United States defendants. Dr. Lefton's supervisors at the Office of Medical Services could and should have anticipated and taken several steps to decrease the likelihood of the medical disaster that occurred here. Defendants could and should have directed Dr. Lefton to focus more attention on his responsibilities and to make himself available in the evenings and on weekends. Furthermore, defendants could and should have imposed additional reporting requirements. For example, they could have advised or ordered Dr. Lefton to report any serious illness immediately by telephone or telegram. Medical officers in Washington

(the only responsible persons competent to fully assess the medical risks in a tropical climate like Monrovia of Dr. Lefton's poor attitude and lack of availability) also could have warned Ambassador Swing and Deputy Chief of Mission Perkins, as well as supporting medical personnel including Nurse Clement and Dr. Feir, to alert the Office of Medical Services immediately to any potential need for medical advice or treatment—such as the first pregnancy of a woman planning to deliver in Monrovia. They could have required Dr. Lefton to put in place plans for the care of the mother and child in the event of a pregnancy of and birth to an AID employee during the time remaining to Dr. Lefton in Monrovia. Had defendants done so, it is more likely than not likely that Dr. Lefton or someone else in Monrovia would have informed the Office of Medical Services of Tarpeh–Doe's pregnancy and delivery and Nyenpan's illness. Had defendants been advised of the pregnancy and delivery, they could have taken steps to assure that Tarpeh–Doe was fully informed of risks to neonates in Monrovia and advised as to safety precautions and that Dr. Lefton was prepared for the event. Had they been advised of Nyenpan's illness on June 3 or 4, or even upon being alerted of the illness by Marilyn Wheeler, presumably on June 5, defendants could have acted promptly to assure that Dr. Lefton was not again declining to provide medical services as he had in the past—by promptly phoning and telegraphing Liberia to find out what the situation was and offering support and advice. Defendants could have arranged for a neonatologist familiar with meningitis to discuss Nyenpan's care directly with Drs. Lefton and Van Reken. Defendants could have advised Dr. Lefton as to whether evacuation was possible or advisable. In that next 24 hours, very likely a crucial period, defendants could have supported and supervised many of Dr. Lefton's decisions. Again, defendants' failure to supervise Dr. Lefton more closely creates uncertainty as to whether, had they acted otherwise, Nyenpan would have recovered. See Daniels, 566 F.2d at 757; Ascher, 533 F.2d at 1238. Defendants thus "[permitted] or [failed] to prevent negligence or other tortious conduct by persons ... under [their] control." Restatement (Second) of Agency § 213. In the unusual circumstances here, having been alerted to Dr. Lefton's deficiencies, knowing the severe risks of tropical diseases such as those confronting a newborn and its mother in Monrovia, defendants had a self-imposed duty to see to it that Dr. Lefton was informed, readily available, and in charge with a previously approved plan for treatment if necessary and hospitalization or evacuation in just such an emergency as occurred here.

## F.

■ Defendants urge the Court to find that Tarpeh–Doe was contributorily negligent by failing to seek Dr. Lefton's services earlier than June 5. This contention is not supportable. Tarpeh–Doe was a 24 year old woman with little experience living and obtaining medical care overseas. She had just experienced her first pregnancy and delivery. She was learning for the first time how to care for an infant, without the support of family or friends from years past, in a country with poor local health facilities. She received virtually no support or medical care from Dr. Lefton. She herself was sick with malaria, staph infection, and mastitis when her infant became critically ill—in that condition she took him to two emergency rooms and the embassy health unit and stayed up overnight in his hospital room, attended only by friends and not by the professionals responsible for her care or the care of her child. Tarpeh–Doe's actions and omissions in this case were reasonable under the circumstances. Therefore, for the reasons stated, defendants are liable to plaintiffs for any damages they suffered.

## III.

## A.

■ Plaintiffs' damages include amounts paid for past care for the child as well as future payments for care and lost income Nyenpan would have earned as an adult. The parties agree on the appropri-

ate method of computing the expected rate of increase in the cost of future medical care offset by the present value of future payment for that care. However, as discussed below, the parties dispute Nyenpan's life expectancy and the amount of future lost wages.

Plaintiffs claim damages of $322,443.57 for Nyenpan's institutionalization at Wheat Ridge Regional Center to date, $4,969.18 for unreimbursed expenses paid by Tarpeh–Doe on his behalf, $4,657,400 for the present value of the cost of future medical and personal care at Wheat Ridge, and $1,008,434 in income and benefits Nyenpan could have received over his lifetime, less expenses and taxes. These claims total $5,993,246.75. Plaintiffs also seek damages for emotional suffering, pain, and disfigurement. Defendants argue that if plaintiffs are entitled to recover, the damage award should total $1,281,563, consisting of $4969 for unreimbursed expenses by Tarpeh–Doe, $702,844 for the present value of future expenses, and lost income of $573,750. Defendants argue that damages should not include the past costs of hospitalization at Wheat Ridge because those costs were paid by Medicare. However, plaintiffs filed on the record in this case an assignment agreement between the Department of Social Services of the State of Colorado and plaintiffs' attorneys. *See* Notice of Filing (filed November 26, 1990). That agreement states that the State of Colorado has the legal right to recover the amount of Medicaid payments made by it from any third party liable for the recipient's injuries. *Id.* In that agreement, plaintiffs agree to pay to Colorado the amount the State has paid in expenses from any recovery up to the amount of 50% of that recovery. Accordingly, damages awarded to plaintiffs by the terms of the agreement will be payable to the State of Colorado to the extent indicated.

#### B.

■ Plaintiffs' expert economist Dr. Herman Miller calculated Nyenpan's lost income to be $1,008,434, using the census tables to determine the present value of the income of an American male college graduate with a work life of 38 years, less taxes and plus benefits. Miller dep. at 15. Defendants, in contrast, argue that the expected earnings should be reduced significantly. *See* Defs. ex. 41; (testimony of Schiller). In support, defendants' expert economist Dr. Bradley Robert Schiller argues that, since Nyenpan's father was Liberian and his mother worked in Liberia when he was born, he could not be expected to spend his entire working life in the United States. (Plaintiffs noted on cross-examination of Dr. Schiller that Ben Tarpeh–Doe was now an American citizen and worked in the United States.) Aside from the reduced wages he could be expected to receive in Liberia, Dr. Schiller argued that his work life would be shorter by several years. He also believed that, once part of his work life had been spent in Liberia, he would receive less income in the United States. Moreover, Dr. Schiller argued that the appropriate measure of future earnings in the United States for Nyenpan (whose mother is white and whose father is black) is the average earnings of black men, not those of all men. Defs. ex. 41; (testimony of Schiller).

Defendants' argument that Nyenpan's projected earnings should be reduced because he might spend part of his working life in Liberia is not convincing. Insufficient evidence exists to support such a reduction. Furthermore, defendants' argument that average black male earnings are an appropriate measure of Nyenpan's future earnings cannot be accepted, since Nyenpan is half black and half white. Moreover, it would be inappropriate to incorporate current discrimination resulting in wage differences between the sexes or races or the potential for any future such discrimination into a calculation for damages resulting from lost wages. The parties did not cite any precedent on this question. Accordingly, upon request by the Court, Schiller submitted a calculation of the average earnings of all college graduates in the United States without regard to sex or race. Defs. ex. 44. Adjusted for changes in worklife expectancy, this calculation resulted in lost wages of $882,692.

Dr. Schiller further adjusted this amount to reduce the income amount to earnings, to include FICA payroll taxes in the tax deduction, and to make certain adjustments in the net discount rate, resulting in total lost wages of $573,750. These adjustments appear to be reasonable and were not contested by plaintiffs. The average wages for all persons are lower than average black male wages; thus, the incorporation of women's expected earnings lowers the estimate even further than defendants' estimate. Nevertheless, estimating Nyenpan's future earnings based on the average earnings of all persons appears to be the most accurate means available of eliminating any discriminatory factors. Accordingly, the accompanying Order grants plaintiffs $573,750 in lost earnings.

### C.

In calculating the cost of future care, plaintiffs rely on the opinion expressed by their expert, Dr. Harold Stevens, a neurologist, that Nyenpan's life expectancy is 10% less than the life expectancy of an average person. *See* Stevens dep at 12. Dr. Stevens based this estimate not on any statistical evidence but on his personal experience of encounters with hundreds of children he had followed through adulthood who had severe nervous system damage. *Id.* at 21–22. He also noted that there is tremendous variability of longevity in persons suffering from post-meningitic syndromes. *Id.* at 22. Plaintiffs' expert economist Dr. Miller testified that the average eight year old male has a life expectancy of 72, i.e. 64.3 additional years. Miller dep. (de bene esse) at 10–11. Thus, plaintiffs assumed that Nyenpan would live 55 more years, 10% less than average. *Id.* at 11. Although costs at Wheat Ridge, which were $232 a day or $84,680 a year in 1990, had increased at the rate of 18% a year during the past five years, Miller estimated the growth rate of medical costs over Nyenpan's life would average 7% a year. *Id.* at 12. In arriving at that figure, he explained that medical costs had increased by an average of 8% a year for the past 20 years, and that he couldn't conceive of their in-

creasing at the rate of 18% a year for the next 55 years. *Id.* at 19. To determine the present value of those costs, Miller used a discount rate of 7%, which he derived from the rate of return on long-term, insured, tax-free municipal bonds. *Id.* at 17 & 20. On the assumption that the increase in cost would equal the discount rate, Miller calculated future medical costs by multiplying the number of years Nyenpan was expected to live (55) by the annual cost of care ($84,680) arriving at $4,657,400. *Id.*

Defendants' expert Dr. Marianne Schuelein testified in contrast that she believed that Nyenpan's life expectancy was an additional 8.3 years, not 55 years. She based that figure on an article in the *New England Journal of Medicine* entitled "The Life Expectancy of Profoundly Handicapped People with Mental Retardation." Defs. ex. 33. A study of 4,513 profoundly mentally retarded persons who were immobile and were fed by others found an average life expectancy for children ages 5–9 to be an additional 8.3 years. Defs. ex. 33 at 588, Table 4. The average life expectancy of persons who survived to the age of 20 rose, rather than fell. Dr. Schuelein also testified that most children with Nyenpan's difficulties die in the first 9 years, and that in her 23 years of experience, she had not seen persons with Nyenpan's injuries survive beyond the age of 20. One of the problems she noted was the difficulty diagnosing diseases in such persons. (Testimony of Dr. Schuelein). Like Dr. Miller, defendants' expert economist Dr. Schiller believed that the increase in medical costs over the years would be offset by the discount rate. Accordingly, defendants estimated Nyenpan's future medical costs to be $702,844.

This conflict of expert opinion as to Nyenpan's life expectancy creates an issue that is difficult to resolve equitably. A lump sum award of damages may be too crude an instrument. If the 8.3 year estimate is too low, the plaintiffs will lose relief to which they are plainly entitled. If the 55 year estimate is too high, they will realize a gross windfall at great expense to the taxpayers. There should be a way to

minimize the guesswork. It can be determined with reasonable certainty what it will cost to maintain Nyenpan per year, i.e. $84,680.00, adjusted in future years for inflation (or deflation).

A solution may be available through one of several alternative mechanisms: (1) defendants could undertake to pay an annual amount (adjusted for inflation) for the benefit of Nyenpan during his lifetime; or (2) defendants could be required to contribute to a trust a discounted principal sum measured originally by the 55 year life expectancy anticipated by plaintiffs' experts, with distributions by the trustee from income and, if necessary, from principal, in amounts appropriate to maintain Nyenpan during his lifetime with the remainder reverting to defendants at his death.[12] *See, e.g., Friends For All Children v. Lockheed Aircraft Corporation*, 563 F.Supp. 552 (D.D.C.1983); 587 F.Supp. 180, 202 (D.D.C.1984). Finally, it is conceivable that (3) commercial insurance companies would be willing to bid on a commercial annuity, the cost of which would be measured by Nyenpan's life expectancy as determined by the insurance carrier on the basis of actuarial experience generally adjusted to reflect Nyenpan's unique condition. *See, e.g., Nemmers v. United States*, 795 F.2d 628, 635 (7th Cir.1986); *but see Friends for All Children*, 563 F.Supp. at 553. Accordingly, the accompanying Order will require counsel for both parties to investigate these alternatives and to file on or before September 9, 1991 either a joint proposal or separate ones for payment by defendant of the cost of maintaining Nyenpan during his remaining years.

Finally, it is found and ruled that, in addition to a sum (to be determined) for future maintenance of Nyenpan, plaintiffs are entitled to (1) $322,443.53 for the cost of his maintenance incurred through October, 1990, (2) $4,969.18 for unreimbursed expenses incurred on behalf of Nyenpan by his mother, Linda Tarpeh–Doe, and (3) $573,750 [13] the present value of Nyenpan's

prospective lost earnings. The accompanying Order will enter judgment for the resulting total of $901,162.71 and schedule further pleadings with respect to reimbursement for the cost future maintenance for life.

### D.

■ Plaintiffs' request for damages for Nyenpan's emotional distress and pain and suffering must be denied. It is highly likely that Nyenpan has suffered and will suffer extreme emotional distress as a result of his condition. However, Nyenpan now receives excellent and caring attention from those who attend to his needs. It is not clear that a monetary award would serve to compensate him for his suffering or otherwise benefit him in any way. Furthermore, such an award may be barred under the FTCA as punitive damages. *See, e.g., Molzof v. United States*, 911 F.2d 18 (7th Cir.1990), *cert. granted,* —— U.S. ——, 111 S.Ct. 1305, 113 L.Ed.2d 239 (1991); *see also Flannery v. United States*, 718 F.2d 108, 111 (4th Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984); *but see Rufino v. United States,* 829 F.2d 354, 362 (2d Cir.1987); *Shaw v. United States*, 741 F.2d 1202, 1208 (9th Cir.1984); *Kalavity v. United States*, 584 F.2d 809, 811 (6th Cir.1978). Should the Supreme Court resolve the split in the circuits on this issue by determining that an award of damages for loss of enjoyment of life to a comatose or similarly incapacitated plaintiff is appropriate under the FTCA, the Court will consider an application from plaintiffs for modification of judgment with respect to damages for pain and suffering.

Plaintiffs request leave to amend their complaint to request a total of $8,000,000 in damages. *See* Plaintiffs' Motion to Amend *ad damnum* to Conform to the Evidence (filed December 3, 1990). That motion is moot. For all of the reasons explained above, an accompanying Order grants judgment for plaintiffs, grants judgment of

---

**12.** It may be that Nyenpan's grandmother could be trustee or co-trustee.

**13.** No trust is contemplated for this sum pending consideration of plaintiffs' obligation for attorneys' fees and disbursements which the court expects to review.

$901,162.71 and requests further briefing on the discount rate and rate of increase in costs to apply to a calculation of future medical costs.

APPENDIX A

Government Exhibit DX–1

UNIFORM STATE/AID/USIA REGULATIONS

686 Medical Travel

686.1 Authorization for Travel of Employee or Dependent

a. Any American Foreign Service employee or any of his dependents as defined in section 681.6a who require medical care for illness or injury not the result of vicious habits, intemperance, or misconduct, while located or stationed abroad in a locality where there is no qualified person or facility to provide such care, and except as provided in section 684.7–4, shall be eligible to travel at Government expense to the nearest facility where suitable medical care can be obtained, whether or not the medical care is at Government expense.

b. The principal or administrative officer (see section 681.4) may authorize travel, with the concurrence of the responsible officer of the respective agency, of any such employee or dependent to the nearest locality abroad where there can be provided suitable medical care, such as diagnosis, specialized examination, special inoculations, emergency dental care, hospitalization, or obstetrical care which, in his judgment, is inadequate or unavailable at the post, and which cannot or should not be delayed until the employee is eligible for home leave, transfer, or other official travel. The principal or administrative officer, drawing upon competent medical advice, shall determine: (1) the medical need for travel, (2) the nearest locality where suitable medical care can be obtained, and (3) the medical need for one or more attendants (see section 686.2).

c. An employee or a dependent may elect to travel for medical care to a locality other than the nearest authorized locality but he will be required to pay any travel cost and, if medical care is at Government expense, any cost of such medical care which exceeds, respectively, the cost of travel to or cost of medical care at the nearest authorized locality.

d. Travel shall not be authorized for employees or dependents to take routine medical examinations or to receive routine immunizations except when local medical facilities are inadequate and (1) direct transfer to another overseas post is scheduled and the Medical Director specifically requests a predeparture medical examination pursuant to section 684.7–2b(3) or (2) a special examination pursuant to section 684.2d is specifically ordered by appropriate officials designated in section 684.3–3.

686.2 Authorization for Travel of Attendants

The services of an attendant or attendants to accompany an employee or a dependent to a locality where suitable medical care can be obtained may be authorized by the principal or administrative officer (see section 681.4) when it is determined on the advice of competent medical authority that the patient is too ill to travel unattended or is too young to travel alone. When the Military Air Command (MAC) is utilized to evacuate a patient, adequate medical attention en route is normally provided by MAC. Some indication of the reason for evacuation should be given to the patient and, in every instance, the basic problem and possible reactions of the patient should be discussed with the attendant. When in the judgment of the principal or administrative officer the services of a nonemployee medical attendant are warranted, such services may be contracted for as indicated in section 686.2b.